UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Unity Healthcare, Inc., et al.,

Plaintiffs,

v.                                                              Case No. 14-CV-114 (JNE/JJK)
                                                                ORDER
County of Hennepin, et al.,

Defendants.

This case was brought by two corporations, and the corporations' African-American owner, that provide housing and medical services for elderly and disabled adults. The named Defendants provide case management services to elderly and disabled adults who receive federal and state waiver benefits for services administered in community settings. Plaintiffs allege in their Second Amended Complaint that Defendants discriminated against them in violation of several federal anti-discrimination laws and deprived them of their constitutional substantive and procedural due process rights. Plaintiffs also bring state anti-discrimination, defamation, and tortious interference claims.

A joint motion to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) was filed by Defendants Meridian Services, Inc. ("Meridian"), Lucy Stewart, People Incorporated ("People"), Angela Reid, Carrie Davies, Axis Healthcare, LLC ("Axis"), and Mary Blegen.[1] Meridian and Stewart have also filed a separate motion that seeks dismissal and reasonable costs

---

[1]     Hennepin County filed an answer and is not before the Court on these motions.

and attorney fees, pursuant to Rule 12(b)(1), Rule 12(b)(6), and Minn. Stat. §§ 554.01 *et seq* and 626.557.[2]

For the reasons set forth below, the joint motion to dismiss is granted in part and denied in part. The portion of Meridian and Stewart's separate motion seeking dismissal pursuant to Minn. Stat. § 626.557 is denied, and the portion seeking dismissal and costs and attorney fees pursuant to Minn. Stat. § 554.01 *et seq* is referred to Magistrate Judge Jeffrey J. Keyes for a report and recommendation.

## BACKGROUND

Minnesota participates in a federal-reimbursement program created by Medicaid that assists certain qualified individuals in obtaining community- and home-based healthcare. The program, known generally as the "waiver program," was designed to help disabled and elderly individuals seek treatment options that are integrated with their community and avoid institutionalized care. The Minnesota Department of Health ("MDH") licenses treatment providers in Minnesota and monitors their compliance with regulations that govern the waiver program.

Plaintiffs Unity Healthcare, Inc. ("Unity") and Dr. Thomas H. Johnson Housing With Services, Inc. ("HWS") are both Minnesota corporations owned by Plaintiff Beth Balenger, who is an African-American woman. Unity provides healthcare services to its clients, some of whom participate in the federal waiver program. HWS provides housing to these clients. Unity operates under home care licenses issued by MDH. In addition, Unity and HWS had a contract with Defendant Hennepin County known as the "Provider Agreement," which governed the amounts Unity and HWS could charge their clients and the standards they had to follow. Under

---

[2]     To avoid redundancy, this Court assumes Meridian and Stewart's separate motion only seeks relief that is not sought in the joint motion to dismiss.

the terms of the Provider Agreement, Hennepin County could cancel the agreement and withhold payment to Unity and HWS, demand that Unity and HWS cease providing services to eligible waiver recipients, discontinue referrals of recipients to Unity and HWS, and remove recipients from Unity and HWS.

Defendants Meridian, People, and Axis provide case management services to individuals participating in the waiver program. During the relevant times, Defendant Lucy Stewart was a case manager at Meridian, Defendants Carrie Davies and Angela Reid were case managers at People, and Defendant Mary Blegen was a case manager at Axis. Through a contract with Hennepin County, these Defendants provided case management services to some of Unity's waiver clients. They did not contract directly with Unity, HWS, or Balenger.

In the spring of 2011, MDH conducted surveys of Unity's operations. In August 2011, MDH formally notified Unity of alleged violations and issued correction orders. On October 11, 2011, MDH issued Unity a publicly available Notice of Noncompliance with Correction Orders and a Notice of Conditional License. The Notice of Noncompliance described multiple instances when Unity failed to provide adequate health care and services. Under the conditional license, Unity was barred from admitting new clients and Unity had to disclose to each of its existing clients that MDH had taken this action against Unity. MDH gave Unity until February 12, 2012 to comply with the correction orders. MDH lifted the conditional license in the summer of 2013.

In December 2011, after MDH placed Unity on a conditional license, Hennepin County announced that it would not renew its Provider Agreement with Unity and HWS. In January 2012, Hennepin County reached an agreement with Unity to extend its contract for three months, subject to weekly monitoring by the County. The contract was eventually extended through 2013.

Plaintiffs allege that, after MDH placed Unity on a conditional license, a Hennepin County case management supervisor instructed case managers, including the moving Defendants, to relocate Unity's clients to other providers.  Plaintiffs allege that the moving Defendants violated several federal and state laws in their attempts to relocate the clients.

## STANDARD OF REVIEW

When ruling on a motion to dismiss, a court must accept the facts alleged in the complaint as true and grant all reasonable inferences in favor of the plaintiff.  *Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009).  Although a complaint need not contain detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly,* 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

## DISCUSSION

Counts I to VI of the complaint are federal anti-discrimination and federal due process claims.  Counts VII to XI are state anti-discrimination, defamation, and tortious interference claims.  This Court will first discuss the federal law claims.

## I.      Federal Law Claims

### A.  42 U.S.C. § 1981

Plaintiffs allege a violation of 42 U.S.C. § 1981, which provides all persons "the same right . . . to make and enforce contracts . . .  and to the full and equal benefit of all laws . . . as is

enjoyed by white citizens." *Id.* at 1981(a).  Plaintiffs seek to enforce section 1981's "full and equal benefit" clause against the moving Defendants.  Second Amended Complaint ¶ 62.  A claim under the "full and equal benefit" clause can only be asserted against state actors, *Youngblood v. Hy-Vee Food Stores Inc.*, 266 F.3d 851, 855 (8th Cir. 2001), *cert. denied*, 535 U.S. 1017 (2002), and a section 1981 claim against a state actor must be asserted through section 1983.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989); *Jones v. McNeese*, 675 F.3d 1158, 1160 n.1 (8th Cir. 2012) (" When raised directly against a state actor, a § 1981 claim must be brought under § 1983.").  Therefore, if the moving Defendants are not state actors, the section 1981 claim based on the "full and equal benefit" clause should be dismissed.  If they are state actors, then the claim of race discrimination should be made under section 1983.  Either way, the section 1981 claim must be dismissed.  The allegations of the denial of equal rights under the law will be construed to be part of Plaintiffs' section 1983 claim for race discrimination.

**B.  42 U.S.C. § 1983—Racial Discrimination**

Plaintiffs allege that Defendants' actions are impermissible racial discrimination in violation of 42 U.S.C. § 1983, which prohibits any person acting under color of law from depriving others of their constitutional rights.  *Id.*  To state a section 1983 race discrimination claim, a plaintiff may allege direct evidence of racial discrimination by state actors.  *See U.S. v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005), *cert. denied*, 546 U.S. 1151 (2006).  A plaintiff may also allege that state actors treated them differently than similarly situated individuals.  *See Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994), *cert. denied*, 513 U.S. 1185 (1995).  Under a similarly situated analysis, a plaintiff's comparators must be "similarly situated in all relevant respects."  *Woods v. Ark. Dep't. of Correction*, 329 Fed. Appx. 688, 692 (8th Cir. 2009).

As a threshold matter, it must be determined whether Unity and HWS have standing to bring a section 1983 claim for racial discrimination, even though they are corporations and not individuals with a racial identity.   Because Plaintiff Balenger does not bring the section 1983 claim, Unity and HWS must have standing for the claim to survive.   Second Amended Complaint at p. 26 (Count II asserted by Plaintiffs Unity and HWS).   The Eighth Circuit has not decided whether a corporation can have a racial identity for the purposes of alleging racial discrimination.   *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 880 (8th Cir. 2003).[3] However, several circuits that have considered the issue have held that corporations can have standing to assert a racial discrimination claim.   *See Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 714-15 (4th Cir. 2014), and cases cited therein. These circuit courts have taken two different approaches to establishing standing.   The Fourth Circuit and Ninth Circuit have held that "a minority-owned corporation may establish an 'imputed racial identity' for purposes of demonstrating standing to bring a claim of race discrimination under federal law."   *Carnell Constr. Corp.*, 745 F.3d at 715 (citing *Thinknet Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1059 (9th Cir. 2004)).   The D.C. Circuit has held that, regardless of the owner's race, a corporation can assert a racial discrimination claim if it suffered an injury because of discriminatory actions that fall within the zone of interests protected by the relevant statute.   *Gersman v. Group Health Ass'n, Inc.*, 931 F.2d 1565, 1569 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992).   For present

---

[3]      In *Oti Kaga*, a case decided before *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377 (2014), the court held that a non-profit corporation established and operated by Native Americans had prudential standing to assert a race discrimination claim, though the court avoided deciding whether, absent such prudential considerations, the corporation would have had standing.   *Oti Kaga*, 342 F.3d at 880, 888.   Because Plaintiffs do not claim to be vindicating rights on behalf of third parties, the same considerations do not apply here.

purposes, the Court will assume that Unity and HWS have standing to assert the section 1983 race discrimination claim.

In addition to establishing standing, the corporate Plaintiffs must plead facts that plausibly suggest that the moving Defendants are state actors. "[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295 (2001) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) (internal quotation marks omitted). To be a state actor, it is not enough that an actor have a contract with the state. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 832-33, 840-42 (1982) (holding that a private school was not a state actor despite its operation under a contract with the state and receipt of state funds). However, both the Supreme Court and the Eighth Circuit have found state action when a private actor had a contract with the state and additional factors strengthened the nexus between the state and the challenged action. *See West v. Atkins*, 487 U.S. 42, 54 (1988) (holding that a physician under contract with the state to provide medical services to inmates in a state prison acted under color of law within the meaning of section 1983); *Smith v. Insley's Inc.*, 499 F.3d 875, 880-81 (8th Cir. 2007) (holding that a towing company acted under color of state law when it had a contract with the state and towed a vehicle at the request of the sheriff's office as part of an official criminal investigation).

Plaintiffs allege that the moving Defendants had a contract with the county to provide case management services and that the county's case management supervisor, Robin Rohr, issued instructions to them. In addition, Plaintiff alleges that the case management services for disabled and elderly adults provided by the moving Defendants "is a function reserved for the state" and "non-state actors have no legal authority to provide" them. Second Amended

Complaint ¶ 4.  Plaintiffs specifically allege that the moving Defendants "are state actors when they provide case manager services in the place and stead of Hennepin County."  *Id.* at ¶¶ 7-13.  Drawing all inferences in favor of the Plaintiffs, it is plausible—though barely so—to infer from these allegations and facts that the moving Defendants acted under color of state law.

The next issue is whether Plaintiffs have alleged enough facts to raise an inference of race discrimination.  Plaintiffs' complaint contains no allegations that Defendants ever made racially biased statements or ever discussed race in any context.  Moreover, the complaint does not allege that Defendants' attempts to remove their clients from Unity are direct evidence of discrimination.  The complaint appears to adopt the theory that discrimination can be shown because Defendants treated similarly situated white-owned competitors more favorably.  The portion of the complaint relevant to the similarly situated analysis reads:

> Caucasian owned facilities, including those owned and/or operated by Pinnacle and defendants Meridian, Axis, and People, Inc., are not held to the same standards as Plaintiffs.  Indeed, Hennepin County and Rohr pushed for Pinnacle taking over Unity's operations knowing that (1) Pinnacle is a competitor of Unity; and (2) Pinnacle has allegedly had its own licensing and safety issues.  Further, although it strongly urged MDH to place Pinnacle on Unity's property in October 2011 for the purpose of servicing Unity's clients, Hennepin County was also aware that Pinnacle did not have the resources or authority to care for Unity's clients.  In addition, although many Caucasian owned entities within Hennepin County have received citations by MDH related to their operations, on information and belief, Hennepin County and its representatives, including the other Defendants, did not take such destructive action against those entities.  In fact, some Caucasian owed [sic] facilities were found to be repeatedly non-complaint with the home health care rules for periods of 1-3 years.  Yet the Defendants continued to do business with these companies and did not engage in such destructive behavior against them.  Moreover, Hennepin County continues to refer waiver participants to Caucasian owned and operated facilities that have had previous license violations.

Second Amended Complaint ¶ 58.

In this paragraph, Plaintiffs identify four potential comparators: Pinnacle and the three entity Defendants.  If Pinnacle is the comparator, the complaint is insufficient as to the moving

Defendants because there is no allegation that any of them favored Pinnacle over Unity.  The complaint repeatedly states that Hennepin County treated Pinnacle differently than Unity, but there is no express allegation that the moving Defendants did the same.  The other three comparators listed in the complaint are the entity Defendants themselves.  If it is true that each entity Defendant favored itself over Unity, the plausible inference is not that it was motivated by racial animus but that it was motivated by self-interest.  Racial animus could still be a plausible motivation for each entity Defendant favoring a different entity Defendant over Unity, though the complaint does not claim that this type of discriminatory relationship occurred among the moving Defendants.  Thus, for the moving Defendants, the complaint is deficient in providing relevant comparators.  *See Hager v. Ark. Dep't. of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013) (discrimination complaint containing only a conclusory allegation that similarly situated comparators were treated differently was insufficient to survive a motion to dismiss).

Even if the Court were to assume that Plaintiffs have sufficiently identified specific comparators, the complaint remains deficient because it does not plausibly suggest that the comparators listed in the complaint were similarly situated to Unity.  Comparators must be similarly situated in all relevant respects, including the misconduct attributable to them.  *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005) (affirming dismissal of discrimination claim in part because comparators' violations were not of "comparable seriousness"), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).  Plaintiffs allege that Unity and the white-owned competitors were similarly situated because the white-owned competitors had "received citations by MDH related to their operations" and were "repeatedly non-compliant with the home health care rules."  Second Amended Complaint ¶ 58.  However, the complaint makes no reference to any other company

being placed on a conditional license, a more serious and public disciplinary action than receiving citations.[4]   The complaint's specific allegations of disparate treatment by the moving Defendants all occurred after, not before, the state imposed the conditional license, at which point Plaintiffs and their comparators were not similarly situated.

The complaint contains many broad allegations of discrimination for which no time frame is disclosed.  Only a few specific instances of alleged misconduct by the moving Defendants can be gleaned from the complaint.  For Meridian's Stewart, the complaint alleges "a particularly startling series of events beginning in January 2012," when Stewart "urged Client A to move, falsely claimed that Client A wished to move, and engaged in various other tactics to get Client A to move and for government agencies to investigate and discipline Unity related to Client A."  Second Amended Complaint ¶ 54.  For Davies and Reid of People, the complaint alleges that, "during 2012," they falsely and "repeatedly told a client ('Client B') that s/he had to move from Unity and HWS, that it was unsafe to remain under Unity's care, and that Unity was interfering with Client B's right to move."  *Id.* at ¶ 56.  For Axis's Blegen, the complaint alleges that in 2012 and "most recently in late summer/fall of 2013 defendant Mary Blegen began encouraging Client C's guardian to move her, falsely claiming that Unity and HWS were unable to meet the Client's needs."  *Id.* at ¶ 57.  Each of these specific instances occurred after Unity failed to timely correct the client-care problems identified by the state in the correction orders issued in August of 2011, and each postdates the October 11, 2011 conditional license.  By October, Plaintiffs and the comparators were not similarly situated because the state licensing authority had determined that Plaintiffs' misconduct required significantly harsher discipline than the comparators'—or, indeed, possibly any other competitor's— misconduct.  From the

---

[4]       At hearing, Plaintiffs' counsel stated that, "[t]o our knowledge, Unity was the first entity that received the conditional license."   Hearing of Sept. 4, 2014.  Transcript, p. 39.

facts alleged, the only plausible inference is that Plaintiffs and their competitors were differently situated at the time of the alleged disparate treatment, and thus Plaintiffs have failed to plead their section 1983 race discrimination claim.  *See Hager*, 735 F.3d at 1015 (affirming dismissal of discrimination claim because the plaintiff "does not allege facts showing that similarly situated [comparators] were treated differently").

It is true, as Plaintiffs argue, that the moving Defendants' non-discriminatory relationship with Plaintiffs in prior years does not foreclose plausible allegations of more recent discrimination.  However, when the alleged disparate treatment occurred only after Plaintiffs were subject to significant and public discipline by the state for failure to provide adequate health care, the plausible inference is not that Defendants were suddenly motivated by racial animus when they sought to move vulnerable clients elsewhere, but rather that they were motivated by the findings of the state licensing authority.  *See Lowe v. J.B. Hunt Transport, Inc.*, 963 F.2d 173, 175 (8th Cir. 1992) ("It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.").

For the entity Defendants, Plaintiffs must show one more element: when a plaintiff is seeking to impose section 1983 liability against an entity, "the plaintiff must show that there is an official policy or a widespread custom or practice of unconstitutional conduct that caused the deprivation of a constitutional right."  *Marksmeier v. Davie*, 622 F.3d 896, 902 (8th Cir. 2010) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)).  The complaint alleges no such policy or custom for Axis, Meridian, or People.

### C.  42 U.S.C. § 1985(3)—Conspiracy to Interfere with Plaintiffs' Civil Rights

Plaintiffs allege a conspiracy to interfere with their civil rights under 42 U.S.C. § 1985(3). To state a section 1985(3) claim, a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving equal protection of the law; (3) an act in furtherance of the conspiracy; and (4) a resulting injury to person, property, or enjoyment of a civil right. *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983). To satisfy the first prong, a plaintiff must allege that there was a meeting of the minds between two or more individuals to deprive the plaintiff of her civil rights. *See McDowell v. Jones,* 990 F.2d 433, 434 (8th Cir. 1993). This requirement is not a heightened pleading standard. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (holding that Rule 9 heightened pleading standard only applies to claims of fraud or mistake).

The conspiracy claim is based on the broad assertion that Defendants "met, discussed, and conspired with the individual defendants, third parties, and competitors of Unity and HWS to deprive Plaintiffs' of their substantive and procedural due process rights and to drive Unity and HWS out of business." Second Amended Complaint ¶¶ 60-63. Somewhat more specifically, Plaintiffs allege that Hennepin County case management supervisor Robin Rohr "instructed all case managers including, but not limited to [the moving Defendants,] to immediately begin relocating Plaintiffs' clients, and required that the case managers keep her informed of their progress." *Id.* at ¶ 45. Plaintiffs also allege that Rohr, Stewart, Davies, Reid and others encouraged case managers to "carefully and frequently scrutinize Unity and report to the police, Adult Protection and MDH any perceived wrong on the part of Unity, HWS, and Balenger." *Id.* at ¶ 44.

These allegations are insufficient to raise a plausible inference of a conspiracy because they provide no specific facts from which to infer that that the moving Defendants had a meeting

of the minds with Hennepin County or with each other to deprive Plaintiffs of their civil rights. *See Rogers v. Bruntrager,* 841 F.2d 853, 856 (8th Cir. 1988) (affirming dismissal of conspiracy claim because "the complaint completely failed to allege any specific facts suggesting such a meeting of the minds") (citation and internal quotation marks omitted). As discussed above, the complaint provides more specific allegations when it describes actions by each entity Defendant's employees. However, because these allegations are of separate incidents involving different Defendants, they do not suggest that there was a collective meeting of the minds among Defendants. *See Habhab v. Hon*, 536 F.3d 963, 969 (8th Cir. 2008) (holding that "isolated incidents of [state] troopers reacting to [plaintiff's] business practices" did not show a conspiracy).

### D. 42 U.S.C. § 2000d—Discrimination in Federally Assisted Programs

Plaintiffs allege a violation of 42 U.S.C. § 2000d ("Title VI"), which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id*. To prevail on a Title VI claim, a plaintiff must be an intended beneficiary of a federally funded program. *Carmi v. Metro. St. Louis Sewer Dist.*, 620 F.2d 672, 674 (8th Cir. 1980) ("Congress did not intend to extend protection under title VI to any person other than an intended beneficiary of federal financial assistance."), *abrogated on other grounds by Consol. Rail Corp. v. Darrone*, 465 U.S. 624 (1984).

Plaintiffs have not sufficiently pled a Title VI claim because the allegations do not support a finding that they were intended beneficiaries of the waiver program. Plaintiffs allege: "The waiver programs allow states to offer a diverse selection of services that are home-and

community-based to individuals who would otherwise be institutionalized." Second Amended
Complaint ¶ 21.  Unity and HWS assert that they are "third party beneficiaries of waiver funds."
*Id.* at ¶ 73.  On the facts alleged, the plausible inference is that recipients, rather than providers of
community-based services, are the intended beneficiaries of the waiver programs.  Congress
intended to prevent the institutionalization of people whose needs could be met in the
community.  Those people, not those who, like Plaintiffs, benefit financially from the program,
are the intended beneficiaries.

### E.  42 U.S.C. § 1983—Substantive and Procedural Due Process

Plaintiffs allege a violation of substantive and procedural due process rights under section
1983.  To state a procedural or substantive due process claim, a plaintiff must allege that there is
"a recognized liberty or property interest at stake." *Johnson v. City of Minneapolis,* 152 F.3d
859, 861 (8th Cir. 1998).  "Property interests are created by existing rules or understandings that
stem from an independent source, such as state law," *id.,* but federal constitutional law
determines whether the interest created by state law rises to the level of a protected property
interest.  *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9 (1978).  To state a procedural
due process claim, a plaintiff must further allege that "the defendant deprived him of such an
interest without due process of law." *Gordon v. Hansen,* 168 F.3d 1109, 1114 (8th Cir. 1999).
To state a substantive due process claim, a plaintiff must further allege government actions that
were "shocking to the contemporary conscience." *Flowers v. City of Minneapolis,* 478 F.3d 869,
873 (8th Cir.2007) (internal quotation marks omitted).

"Analysis of either a procedural or substantive due process claim must begin with an
examination of the interest allegedly violated." *Dover Elevator Co. v. Ark. State Univ.*, 64 F.3d
442, 445-46 (8th Cir. 1995).  Plaintiffs' complaint can be construed to assert three property

interests: their contract with Hennepin County, their business relationships with their clients, and their business reputation. The contract interest is insufficient to state a due process claim for two reasons. First, the existence of a contract between Plaintiffs and the state does not create cognizable due process property interests, and "a simple breach of contract does not rise to the level of a constitutional deprivation." *Id.* at 446 (quoting *Medical Laundry Serv. v. Bd. of Trustees of Univ. of Ala.*, 906 F.2d 571, 573 (11th Cir. 1990)). Second, Plaintiffs do not allege that the moving Defendants were party to a contract with them.

Plaintiffs' asserted property interest in the continued business relationship with their clients and the compensation received from those relationships is also insufficient. Plaintiffs do not allege that Defendants succeeded in shutting down their businesses. Rather, Plaintiffs allege that Defendants' actions caused them to lose profits because some clients left. But there is no protected property interest in the expected profits and value of a business. *See Minneapolis Taxi Owners Coalition, Inc. v. City of Minneapolis*, 572 F.3d 502, 510 (8th Cir. 2009) ("taxicab licensees do not have protected property interests in the market value of their licenses"). Plaintiffs allege that their clients, as participants in the waiver programs, had "the right to live in the most integrated setting of their choice." Second Amended Complaint ¶ 26. Plaintiffs' "subjective and unilateral expectation" that those clients would choose to continue to stay with them is not sufficient to create a protected property interest. *Schueller v. Goddard*, 631 F.3d 460, 463 (8th Cir. 2011) (citing *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 803 (8th Cir. 2004)) (internal quotation marks omitted).

Finally, Plaintiffs' interest in their reputation is also insufficient because "injury to a licensed professional's reputation is insufficient to sustain a due process liberty claim." *Austell v. Sprenger*, 690 F.3d 929, 937 (8th Cir. 2012). Thus, Plaintiffs' substantive and procedural due

process claims must fail because Plaintiffs have not pled facts that plausibly suggest they had a constitutionally protected property interest.

Even if Plaintiffs had a property interest, to succeed on a substantive due process claim, Plaintiffs must show that state actors impermissibly interfered with the protected property interest in such a way as to "shock the conscience or otherwise offend our judicial notions of fairness, or must be offensive to human dignity." *Brown v. Nix*, 33 F.3d 951, 953 (8th Cir. 1994); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (establishing that the cognizable level of executive abuse of power under the substantive due process clause is that which shocks the conscience). The allegations in Plaintiffs' complaint do not meet this high bar. Plaintiffs' conclusory allegations that Defendants' actions were "intrusive and outlandish" and "conscious shocking" do not pass muster under *Iqbal*. Second Amended Complaint ¶ 79.

## II.    State Law Claims

### A.  Minn. Stat. § 363A.17—Business Discrimination

Plaintiffs allege that Defendants violated Minnesota's business discrimination law, Minn. Stat. § 363A.17(3), which establishes liability for defendants who "intentionally refuse to do business with, to refuse to contract with, or to discriminate in the basic terms, conditions, or performance of the contract" with a plaintiff for discriminatory reasons. *Id.*

In *Krueger v. Zeman Construction Co.*, 781 N.W.2d 858 (Minn. 2010), the Minnesota Supreme Court considered whether this statute creates a private cause of action in favor of a person not a party to a contract. *Id.* at 863. The court "concluded that section 363A.17 is unambiguous and does not provide a cause of action for a person not a party to a contract" and the statute does "not provide remedies to persons other than the contracting parties." *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 690

(Minn. 2014) (citing *Krueger*, 781 N.W.2d at 863-64).  Plaintiffs allege that they conducted business with the moving Defendants, but they do not allege that they had a contract with them. Thus, under *Krueger*, they do not articulate a cause of action against the moving Defendants for a violation of Minn. Stat. § 363A.17.

Plaintiffs argue that they have a cause of action against the moving Defendants under section 363A.17 because the "refuse to do business with" clause of the statute does not require a contract.  However, the Minnesota Supreme Court's most recent interpretation of *Krueger*, which is quoted above, does not distinguish this clause from the statute's other clauses when it states that section 363A.17 "does not provide a cause of action for a person not a party to a contract."  *Graphic Commc'ns*, 850 N.W.2d at 689-90.  Furthermore, even if the "refuse to do business with" clause does not require a contract, Plaintiffs' complaint suggests that the moving Defendants provided case management services to their clients during the relevant times, while they also advised the clients to leave Unity and attempted to influence Unity's and HWS's relationships with those clients.  Plaintiffs do not cite any authority interpreting the "refuse to do business with" clause expansively to include this kind of advice and influence.  Plaintiffs allegations that they and the moving Defendants engaged in "joint business" similarly fails because Plaintiffs cite no authority expanding 363A.17 to cover non-contractual "joint business" relationships.  Thus, the allegations do not plausibly suggest that the moving Defendants refused to do business with Plaintiffs within the meaning of Minn. Stat. § 363A.17.

### B.  Defamation

Plaintiffs also allege that each Defendant defamed them.  To prove defamation, a plaintiff must show that the defendant made "(a) a false and defamatory statement about the plaintiff; (b) in unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the

community." *Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1011 (8th Cir. 2005) (citation and internal quotation marks omitted), *abrogated on other grounds by Torgerson v. City of Rochester,* 643 F.3d 1031 (8th Cir. 2011).  Federal courts favor specific pleading of defamation claims because "knowledge of the exact language used is necessary to form responsive pleadings." *Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 699 (8th Cir. 1979).  "At a minimum, the plaintiff must allege who made the allegedly libelous statements, to whom they were made, and where." *Pope*, 406 F.3d at 1011 (citation and internal quotation marks omitted).  Also, only statements of fact are actionable because the "First Amendment protects statements of pure opinion from defamation claims." *McKee v. Laurion*, 825 N.W.2d 725, 733 (Minn. 2013).

The complaint contains generalized allegations of defamation that are insufficient to state a claim.  Each Defendant is more specifically alleged to have made defamatory statements.  The Court turns now to those allegations.

### 1.   *The Defamation Claims Against Blegen and Axis*

The specific defamatory statement alleged to have been made by Blegen of Axis is that, "in the late summer/fall of 2013 defendant Mary Blegen began encouraging Client C's guardian to move her, falsely claiming that Unity and HWS were unable to meet the Client's needs." Second Amended Complaint ¶ 57.  This allegation does not allege where the statements occurred, but more importantly cannot reasonably be interpreted as stating a fact that can be proven true or false.  Blegen's alleged statement, without more, represents her opinion that the client would be better served elsewhere.  *See Kapoor v. Brown*, No. A13-1402, 2014 WL 1516589, at *4 (Minn. Ct. App. Apr. 21, 2014) (doctor's statement that she did not want another doctor involved in her patients' care was mere expression of preference and not representation of potentially defamatory fact).

The complaint also alleges that "Hennepin County representatives falsely informed the guardian [of Client C] that Unity/HWS was closing." Second Amended Complaint ¶ 57. This statement purports to state a potentially defamatory fact, but it too fails to meet the pleading standard because it does not identify who made the defamatory statement.

2. *The Defamation Claims Against Davies, Reid, and People*

For Davies and Reid of People, the defamatory remarks attributed to them occurred "during 2012," when they falsely and "repeatedly told a client ('Client B') that s/he had to move from Unity and HWS, that it was unsafe to remain under Unity's care, and that Unity was interfering with Client B's right to move." Second Amended Complaint ¶ 56. In addition, Plaintiffs allege that Davies and Reid, "in the presence of others, including clients and staff, [] falsely accused Plaintiffs and their counsel of interfering with Client B's right and desire to move." *Id.* Although the complaint does not clearly state where these statements occurred, it can be inferred that they happened at HWS because Client B was presumably living there.

Nevertheless, the allegations lack the requisite specificity. Plaintiffs' allegations do not reference specific facts that Defendants could argue were true or privileged. This vagueness is compounded by the broad time frame—all of 2012—given for when the statements might have occurred. *See Deleski Ins. Agency, Inc. v. Allstate Ins. Co.*, No. 13-CV-1780, 2013 WL 6858573, at *12 (D. Minn. Dec. 30, 2013) (dismissing defamation claim because "Plaintiffs do not allege specific facts to show when the statement was made, to whom, and in what context."). Thus, Plaintiffs fail to state a claim for defamation against Davies, Reid, or People.

3. *The Defamation Claims Against Stewart and Meridian*

For Stewart of Meridian, the alleged defamation occurred in August 2012, when Stewart "caused to be filed a false police report alleging that Client A was being sexually and possibly

physically abused at HWS by a Unity employee," and when Stewart "called an ambulance and demanded that Client A be removed from Unity/HWS because she was endangered and needed a medical examination."  Second Amended Complaint ¶ 54.

The allegations of defamation against Stewart and Meridian are the most specific ones in the complaint.  They provide the narrowest time frame for when the alleged defamation occurred, and the alleged defamatory statements to third parties are the most factual.  Moreover, it can be inferred that the defamation was stated in an official report to the police and on a phone call to emergency respondents.  Although exact quotations are lacking, these allegations are sufficiently specific to state a claim for defamation.  *See Schibursky v. Int'l Bus. Mach. Corp.*, 820 F. Supp. 1169, 1181 (D. Minn. 1993) ("The fact that [plaintiff] failed to recite the exact language spoken is not fatal to her defamation claim.").

Stewart and Meridian argue that the defamation claim should fail because Stewart's statements were true—that is, Stewart was not falsely accusing Unity of abusing Client A but truthfully reporting to others what Client A had told her.  However, the issues of whether Client A accused Unity of abuse and whether Stewart reported that accusation without becoming a publisher of defamation herself raise factual questions inappropriate for resolution at this stage of litigation.  Stewart and Meridian also argue that the claim is barred by Minn. Stat. § 626.557, which provides that case managers must report accusations of maltreatment of a vulnerable adult to a designated county unity, known as a "common entry point," and that any "person who makes a good faith report is immune from civil or criminal liability that might otherwise result from making the report."  *Id.* at subds. 4, 5.  However, when a party asserts a privilege as a defense, the burden is usually on that party to demonstrate the existence of the privilege.  *See Jadwin v. Minneapolis Star & Trib. Co.*, 367 N.W.2d 476, 481 (Minn. 1985).  Defendants do not

argue that the usual allocation of burdens does not apply here, and, at this early stage, they have

not shown that Stewart acted in "good faith" as required for immunity under the statute.

Plaintiffs also allege that Stewart defamed them when she called the ambulance, an act that

conceivably could fall outside the statutory reporting process and statutory privilege.

      Stewart and Meridian also argue that all state law claims against them, including the

defamation claims, should be dismissed pursuant to Minnesota's anti-SLAPP law.  Defendants'

anti-SLAPP motion is discussed in section E below.

### C.  Tortious Interference with Contracts

      Plaintiffs allege tortious interference of their contractual relationships with their clients.

To prevail on this claim, Plaintiffs must show: (1) the existence of a contract; (2) defendants

knew about the contract; (3) intentional procurement of its breach; (4) without justification; and

(5) damages.  *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.,* 325 N.W.2d 20, 25

(Minn. 1982).  As a threshold matter, Balenger does not allege that she was a party to any

contract with the clients.  Therefore, her tortious interference claim is dismissed, leaving Unity

and HWS to assert the claim against Defendants.

      Plaintiffs broadly assert that Defendants' actions led to them "loosing [sic] over half of

their clients."  Second Amended Complaint ¶ 48.  This allegation is too broad to state a claim for

tortious interference because it does not identify specific contracts that were breached or suggest

that Defendants knew of the contracts.  This Court will now turn to whether the more specific

allegations against the moving Defendants are sufficient to state a claim for tortious interference.

    *1.  The Tortious Interference Claim Against Blegen and Axis*

      Plaintiffs allege that Axis's Blegen "falsely" encouraged Client C to move.  Second

Amended Complaint ¶ 57.  The allegation fails to state a tortious interference claim because

Plaintiffs do not allege that Defendants procured a breach of contract.  The complaint clearly states that, despite Blegen's efforts, "Client C's guardian refused to move Client C."  *Id.*

2.   *The Tortious Interference Claim Against Davies, Reid, and People*

For Davies, Reid, and People, the complaint suggests that Unity and HWS had contracts with Client B, Defendants knew of the contracts, Defendants procured a breach of the contracts when they moved Client B from Unity, and Unity and HWS lost money as a result.  *Id.* at ¶ 56. These allegations are sufficient to state a claim for tortious interference with respect to Unity and HWS's contracts with Client B.

Defendants argue that Plaintiffs have not sufficiently pled that the interference was unjustified.  However, "[o]rdinarily, whether interference is justified is an issue of fact," and "[t]he burden of proving justification is on the defendants."  *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994).  At this early stage of litigation, Defendants have not proved justification.

Defendants also argue that the tortious interference claim is duplicative of the defamation claim because it is based on the same underlying conduct, and the former claim should be subsumed by the latter.  This argument is based on the Minnesota Supreme Court's holding that a plaintiff's "claim of wrongful interference with business relationships by means of defamation is essentially a part of his cause of action for defamation" and thus comes within the statute of limitations for defamation and not tortious interference.  *Wild v. Rarig*, 234 N.W.2d 775, 793 (Minn. 1975).  However, the Minnesota Supreme Court confined its holding in *Wild* to "the facts of this case," and it is unclear whether the holding has any application outside statute of limitations issues.  *Id.*  This Court need not wrestle with the scope of the holding in *Wild*, though, because Plaintiffs' tortious interference and defamation claims do not depend entirely on the same underlying conduct.  Plaintiffs allege that the Defendants moved Client B to another

22

provider. Second Amended Complaint ¶ 56. The act of moving the client is not defamatory, though it might constitute tortious interference.

### 3. The Tortious Interference Claim Against Stewart and Meridian

Plaintiffs' allegations against Stewart and Meridian are sufficient to state a claim for tortious interference with respect to Unity and HWS's contracts with Client A. It can be plausibly inferred from the complaint that Plaintiffs had contracts with Client A, Defendants knew about the contracts, Defendants procured a breach of the contracts when Stewart had the ambulance remove the client from Unity without justification, and Plaintiffs Unity and HWS lost money as result. Second Amended Complaint ¶¶ 53-55. Stewart and Meridian's arguments that they are protected by a privilege or statutory justification fail for the reasons previously stated with respect to the defamation claims against them.

## D. Tortious Interference with Prospective Contracts

Plaintiffs assert a claim for tortious interference with prospective contracts. To state this claim, Plaintiffs must show: (1) the existence of a reasonable expectation of economic advantage; (2) defendant's knowledge of that expectation of economic advantage; (3) defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage and the interference was either independently tortious or in violation of a state or federal statute or regulation; (4) that in the absence of the wrongful act, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and (5) the plaintiff sustained damages. *Gieseke v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

Plaintiffs do not satisfy the fifth prong against any moving Defendant because they do not identify specific clients whose business was lost as a result of the alleged interference. *See id.* at 221-22 (establishing in tortious interference claims a "requirement to identify specific third

parties with whom the plaintiff claims prospective economic relationships"). Plaintiffs'

argument that the identity of specific clients is protected by law is no excuse. In their complaint,

Plaintiffs identify specific clients with whom they had contracts as Client A, B, and C. They

have not provided similar specificity with respect to prospective clients. Moreover, Plaintiffs

could have moved to produce those names under seal. Thus, Plaintiffs fail to state a claim for

tortious interference with prospective contracts.

### E. The Anti-SLAPP Motion

Defendants Stewart and Meridian, in addition to their motion to dismiss for failure to

state a claim, have moved to bar the state law claims against them under Minnesota's anti-

SLAPP statute, Minn. Stat. §§ 554.01-.05. The statute provides: "Lawful conduct or speech that

is genuinely aimed in whole or in part at procuring favorable government action is immune from

liability, unless the conduct or speech constitutes a tort or a violation of a person's constitutional

rights." Minn. Stat. § 554.03. Procedurally, after an anti-SLAPP motion is filed, the court must

determine whether the party seeking dismissal has made a threshold showing that the underlying

"claim materially relates to an act of the moving party that involves public participation." Minn.

Stat. § 554.02, subd. 1. If the moving party has made its threshold showing, the second step is to

determine whether the party responding to the motion has produced clear and convincing

evidence that the moving party is not entitled to immunity. Minn. Stat. § 554.02, subd. 2(3).

The Minnesota Supreme Court has recently held that the responding party cannot meet its burden

through reliance on the allegations but must "produce evidence to defeat an anti-SLAPP

motion." *Leiendecker v. Asian Women United of Minnesota*, 848 N.W.2d 224, 233 (Minn.

2014). In addition, the responding party must typically meet this burden without discovery

because discovery is suspended once an anti-SLAPP motion is filed, unless the responding party

can show "good cause" for limited discovery.  Minn. Stat. § 554.02, subd. 2(1).  If the moving party prevails on its anti-SLAPP motion, it shall be awarded attorney fees and can petition the court for damages.  *Id.* at § 554.04.

This Court refers Stewart and Meridian's anti-SLAPP motion to Magistrate Judge Jeffrey J. Keyes for a report and recommendation.

### III.  CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Joint Motion to Dismiss [Docket No. 127] is GRANTED IN PART and DENIED IN PART as follows:

   a. The motion is DENIED as to Plaintiffs' defamation claims against Defendants Meridian and Stewart with respect to statements about Plaintiffs' treatment of Client A (Counts VIII-IX).

   b. The motion is DENIED as to Unity's and HWS's tortious interference claim against Defendants Meridian and Stewart with respect to Unity's and HWS's contracts with Client A (Count X).

   c. The motion is DENIED as to Unity's and HWS's tortious interference claim against Defendants People, Davies, and Reid with respect to Unity's and HWS's contracts with Client B (Count X).

   d. In all other respects, the motion is GRANTED and the claims DISMISSED.

2. Defendants Meridian and Stewart's Motion to Dismiss [Docket No. 125] is DENIED and REFERRED as follows:

a. The portion of the motion seeking dismissal pursuant to Minn. Stat. § 626.557

   is DENIED.

b. The portion of the motion seeking dismissal and reasonable costs and attorney

   fees pursuant to Minnesota's anti-SLAPP law, Minn. Stat. §§ 554.01-.05, is

   referred to Magistrate Judge Jeffrey J. Keyes for a Report and

   Recommendation pursuant to 28 U.S.C. § 636(b)(1).

Dated:  December 2, 2014

                                        s/Joan N. Ericksen
                                        JOAN N. ERICKSEN
                                        United States District Judge