# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Unity Healthcare, Inc.; Dr. Thomas H. Johnson Housing With Services, Inc.; and Beth Balenger; | Civil No. 14-114 (JNE/JJK) |
| Plaintiffs, | |
| v. | |
| County of Hennepin, a government entity incorporated under the laws of the State of Minnesota; Hennepin County Human Services and Public Health Department; Robin Rohr; John Doe 1 through John Doe 15; Jane Doe 16 through Jane Doe 30; Meridian Services, Inc.; Lucy Stewart, individually; People Incorporated; and Angela Reid, individually; | **REPORT AND RECOMMENDATION** |
| Defendants. | |

Lateesa T. Ward, Esq., and Tekia S. Jefferson, Esq., Ward & Ward, P.C., counsel for Plaintiffs.

Daniel P. Rogan, Esq., and Daniel D. Kaczor, Esq., Hennepin County Attorney's Office, counsel for Defendants Hennepin County, Hennepin County Human Services and Public Health Department, and Robin Rohr; Eugene C. Shermoen, Jr., Esq., Sarah E. Bushnell, Esq., and Timothy J. Carrigan, Esq., Arthur, Chapman, Kettering, Smetak & Pikala, PA, counsel for Defendants Meridian Services, Inc., and Lucy Stewart; Daniel R. Olson, Esq., Jeffrey D. Klobucar, Esq., and Jonathan P. Norrie, Esq., Bassford Remele, PA, counsel for Defendants People Incorporated, and Angela Reid.

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

Unity Healthcare, Inc. ("Unity"), Dr. Thomas H. Johnson Housing With Services, Inc. ("HWS"), and Beth Balenger, the plaintiffs in this case, provide housing and medical services for elderly and disabled adults.  Two of the defendants, Meridian Services, Inc. ("Meridian") and Lucy Stewart, provide case management services to elderly and disabled adults who receive federal and state waiver benefits for services administered in community settings.  Stewart is Meridian's employee, and she provided case management services for at least one of the plaintiffs' clients.  As is relevant to this report and recommendation, the plaintiffs assert a defamation claim against Meridian and Stewart alleging that in August 2012, Stewart caused a false police report to be filed claiming that one of the plaintiffs' clients, Client A, was being sexually and physically abused by a Unity employee.  The plaintiffs also allege that Stewart called an ambulance and demanded that Client A be removed from the care of Unity and HWS because Client A was endangered and needed a medical examination.  The plaintiffs assert a second claim for tortious interference with contract against Meridian and Stewart in which they allege that the plaintiffs had contracts with Client A, Meridian and Stewart knew about those contracts, and Meridian and Stewart procured a breach of the contracts when Stewart had an ambulance remove Client A from Unity without justification, causing Unity and HWS to lose money.

Meridian and Stewart filed a motion to dismiss the plaintiffs' state-law defamation and tortious-interference claims, arguing that such claims are barred by Minnesota's anti-SLAPP[1] statutes, codified at Minnesota Statutes sections 554.01-.05.  The District Court referred this motion to this Court for proposed findings of fact and recommendations.  (Doc. No. 141 at 26, § III, ¶ 2.b.)  The anti-SLAPP statutes provide that: "[l]awful conduct or speech that is genuinely aimed in whole or in part at procuring favorable government action is immune from liability, unless the conduct or speech constitutes a tort or a violation of a person's constitutional rights."  Minn. Stat. § 554.03.  To deter lawsuits concerning a defendant's lawful conduct or speech that is genuinely aimed at procuring favorable government action, "Minnesota's anti-SLAPP statutes authorize an anti-SLAPP motion, which is a motion to secure dismissal 'on grounds that the claim materially relates to an act of the moving party that involves public participation.'"  *Leiendecker*, 848 N.W.2d at 228 (quoting Minn. Stat. § 554.02, subd. 1); *see also* Minn. Stat. § 554.02, subd. 2 (establishing a procedure for resolving a motion in a judicial proceeding to dispose of a claim in a SLAPP suit).  In the motion now before this Court, Meridian and Stewart seek dismissal of the plaintiffs' defamation and tortious-interference claims by arguing that the conduct underlying these claims was neither defamatory nor tortious

---

[1]      SLAPP is an acronym referring to "Strategic Lawsuits Against Public Participation."  *Leiendecker v. Asian Woman United of Minn.*, 848 N.W.2d 224, 227-28 (Minn. 2014).

interference, but instead constituted lawful conduct or speech aimed at procuring favorable government action.

The anti-SLAPP statutes "set out 'a unique procedural framework,'" which a court applying Minn. Stat. § 554.02 must use to determine whether defendants are immune from liability on the plaintiffs' defamation and tortious-interference claims. *See Leiendecker*, 848 N.W.2d at 228-29 (quoting *Middle-Snake-Tamarac Rivers Watershed Dist. v. Stengrim*, 784 N.W.2d 834, 839 (Minn. 2010)). When a party files an anti-SLAPP motion, and makes a threshold showing that the underlying "claim materially relates to an act of the moving party that involves public participation," the party responding to the motion must produce "clear and convincing evidence" that the moving party is not entitled to immunity. Minn. Stat. §§ 554.02, subd. 1, subd. 2(3). The responding party cannot meet its burden by relying on allegations in a pleading, but must "produce evidence to defeat [the] anti-SLAPP motion." *Leiendecker*, 848 N.W.2d at 229. The responding party must typically meet this burden without discovery because discovery is suspended once an anti-SLAPP motion is filed, unless the responding party can show "good cause" for "specified and limited discovery." Minn. Stat. § 554.02, subd. 2(1). If the moving party prevails on its anti-SLAPP motion, it shall be awarded attorney fees and can petition the court for damages. *Id.* § 554.04.

The District Court already determined that Meridian and Stewart made the threshold showing, and in an Order dated December 8, 2014, this Court rejected

4

the plaintiffs' argument that the District Court has withdrawn that conclusion.  The

parties were thus required to submit briefing and evidentiary materials

addressing whether the plaintiffs have met their burden to show by clear and

convincing evidence that Meridian and Stewart are not entitled to immunity.

(Doc. No. 147, Order date Dec. 8, 2014 at 3-5.)

In evaluating whether the plaintiffs have met this burden the Court is

required "to make a finding about whether 'the responding party has produced

clear and convincing evidence that the acts of the moving party' are not immune."

*Leiendecker*, 848 N.W.2d at 231 (quoting Minn. Stat. § 554.02, subd. 2(3)).  This

standard is not the same as that applied in ruling on a party's motion for

summary judgment.  *Id.*  The party responding to the anti-SLAPP motion "carries

three distinct burdens 'on the motion': the burden of proof, the burden of

production, and the burden of persuasion."  *Id.*  As the responding party,

therefore, the plaintiffs "bear[] the burden to persuade the trier of fact—here, the

district court—of the truth of a proposition—here, that the acts of the moving

party are not immune—and if it does not do so, then the court *must* 'grant the

motion and dismiss the judicial claim.'"  *Id.* (quoting Minn. Stat. § 554.02, subd.

2(3)) (emphasis in original).  "[T]he court is *required* to dismiss the claim, even in

the face of genuine issues of material fact, if the responding party has failed to

carry its burden of persuasion that the moving party is not immune by clear and

convincing evidence."  *Id.* (emphasis in original); *see also State Bank of*

*Bellingham v. BancInsure, Inc.*, Civil No. 13-cv-900 (SRN/JJG), 2014 WL

5

4829184, at *14 (D. Minn. Sept. 29, 2014).  The responding party can do so "'by establishing that the moving party's conduct or speech was not aimed in whole or in part at procuring favorable government action, that the conduct or speech constituted a tort, or that the conduct or speech violated another's constitutional rights.'" *State Bank of Bellingham*, 2014 WL 4829184, at *14 (quoting *Leiendecker*, 848 N.W.2d at 229).

Before turning to the question whether the plaintiffs have shown by clear and convincing evidence that Meridian and Stewart are not entitled to immunity, we first address an issue that neither of the parties briefed initially, but on which this Court ordered supplemental briefing be provided.  On March 11, 2015, this Court issued an Order for Supplemental Briefing "addressing the issue whether Minnesota's anti-SLAPP law conflict with any Federal Rules of Civil Procedure, such as Rule 12 and Rule 56, and therefore does not apply to a federal court addressing state law claims over which the Court is exercising pendent jurisdiction."  (Doc. No. 188, Order at 2.)   The parties provided memoranda addressing their positions on these issues on March 18, 2015.  In Part I of this Report and Recommendation, this Court concludes that the motion to dismiss procedures laid out in Minnesota's anti-SLAPP statute, specifically the procedure established by Minn. Stat. § 554.02, subd. 2, irreconcilably conflicts with Rules 12 and 56 of the Federal Rules of Civil Procedure.  For that reason, this Court recommends that Meridian and Stewart's anti-SLAPP motion be denied.

Ordinarily, this would end the Court's opinion on a motion such as this one; the Court would not have to analyze the merits of the anti-SLAPP motion.  But this matter has been referred for a report and recommendation, the point of which is to provide the District Court with a recommendation that will assist the Court in resolving the motion in as efficient a manner as possible without having to return the motion to this Court for work that was not completed, and thus delay the proceedings. This Court therefore provides an alternative ruling in Part II.  In the event the District Court disagrees with the conclusion in Part I of this report and recommendation, in Part II this Court applies Minnesota's anti-SLAPP law and concludes that the plaintiffs have failed to meet their burden of showing that Meridian and Stewart are not entitled to immunity under the anti-SLAPP law. The plaintiffs have failed to show by clear and convincing evidence that Meridian and Stewart's conduct: (1) was not aimed at procuring favorable government action; or (2) was defamatory or constituted tortious interference with the plaintiffs' contracts with Client A.[2]  *See Mullen v. J.P. Morgan Chase*, No. 1:13cv268, 2014 WL 3738076, at *3 (W.D. Mich. July 29, 2014) (providing alternative recommendation if the district court disagree with magistrate judge's conclusion that action should be dismissed); *Millwee v. Utah Div. of Child and Family Servs.*, No. 2:11-cv-DB-DBP, 2013 WL 1180773, at *6-10 (D. Utah Mar.

---

[2]     The plaintiffs have not argued that the allegedly tortious conduct supporting the defamation and tortious-interference claims against Meridian and Stewart violated the plaintiffs' constitutional rights.

7

4, 2013) (concluding that motion to dismiss should be granted and other pending motions should be denied as moot, but providing alternative recommendations for remaining motions if the district court disagreed with dismissal recommendation).

## I.   Whether The Anti-SLAPP Motion to Dismiss Can be Applied in This Case

### A. *Shady Grove* and the Resolution of Conflicts Between State and Federal Rules

The plaintiffs' claims for defamation and tortious-interference are governed by Minnesota law.  Meridian and Stewart brought their anti-SLAPP motion to dismiss under Minnesota's anti-SLAPP statutes, Minn. Stat. § 554.02, subd. 2, which they contend must be applied because Minnesota law provides the rule of decision in this case.  (Doc. No. 189, Defs. Meridian and Stewart's Suppl. Mem. in Supp. of Their Anti-SLAPP Mot. ("M&S Suppl. Mem."), *passim.*)  The anti-SLAPP motion to dismiss standards are found in Minnesota Statutes Section 554.02, subd. 2, and in *Leiendecker* the Minnesota Supreme Court explained the plain meaning of that statutory provision.  As described in *Leiendecker* and in the discussion above, under Section 554.02, subd. 2, once a defendant makes the minimal showing that the speech or conduct forming the basis of the plaintiff's claims against it was genuinely aimed at procuring favorable government action, the burden shifts to the plaintiff to produce clear and convincing evidence that the defendant's conduct was not immune.  *Leiendecker*, 848 N.W.2d at 229; Minn. Stat. § 554.02, subd. 2(2)-(3).  A court reviewing such a motion does not give the

8

plaintiff the benefit of the doubt on its evidence by viewing the facts in the light

most favorable to the plaintiff; instead, the court weighs the evidence and asks

whether the plaintiff has persuaded the court to view the facts in a way that

favors the plaintiff's claims.  *Leiendecker*, 848 N.W.2d at 231.  As a result,

Section 554.02, subd. 2, allows a court to resolve an anti-SLAPP motion and

"dismiss a plaintiff's claim on a preliminary basis in a different manner than it

would otherwise resolve a preliminary motion attacking the merits of a case

under Rules 12 or 56."  *See Intercon Solutions, Inc. v. Basel Action Network*,

969 F. Supp. 2d 1026, 1041 (N.D. Ill. 2013); *3M Co. v. Boulter* (*Boulter I*), 842 F.

Supp. 2d 85, 93 (D.D.C. 2012) (discussing the District of Columbia's special

motion to dismiss procedure under its anti-SLAPP law and noting that procedure

"mandates that a court resolve a 'special motion to dismiss' in a different manner

than it would otherwise resolve a preliminary motion attacking the merits of a

case under Rule 12 or 56").

When a federal rule and a state law both appear to govern a question in a

federal court, the Supreme Court has established a two-step framework to

determine which rule must be applied.[3]  *Shady Grove Orthopedic Assocs. v.*

---

[3]    Although this doctrine arose in the domain of diversity cases, its principles
also apply in federal question cases that include state law claims (like this case).
*See Felder v. Casey*, 487 U.S. 131, 151 (1988) (explaining that when a federal
court exercises "pendent jurisdiction over state-law claims," it is constitutionally
obligated under *Erie* to "apply state law to state claims"); *see also Witzman v.
Gross*, 148 F.3d 988, 990 (8th Cir. 1998) ("When considering [the plaintiff's]
supplemental state-law claims, we are bound by Minnesota law.") (citing *Mangold*
(Footnote Continued on Following Page)

9

*Allstate Ins.*, 559 U.S. 393, 398 (2010); *see also id.* at 421 (Stevens, J.,

concurring).  The Supreme Court has made it clear that if a federal rule "answers

the question in dispute," *id.* at 398, or is "sufficiently broad to control the issue

before the court," *id.* at 421 (Stevens, J., concurring), federal courts must apply

the federal rule without turning to the familiar, but vexing, substantive-or-

procedural inquiry under *Erie.*[4]  *See Burlington Northern R. Co. v. Woods*, 480

---

(Footnote Continued from Previous Page)
*v. Cal. Pub. Util. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995) ("The *Erie*
principles apply equally in the context of pendent jurisdiction.")); *Penobscot
Indian Nation v. Key Bank of Me.*, 112 F.3d 538, 557 n.27 (1st Cir. 1997)
(applying in a federal question case, state substantive law to those claims that
involved state law).

[4]     *Shady Grove* was decided by a fragmented Supreme Court.  No opinion
had the assent of five Justices, though Justice Stevens' concurring opinion
reached the same outcome as the plurality opinion written by Justice Scalia.
Justice Stevens articulated the first step in the analysis somewhat differently than
it is framed in the plurality.  At the first step, rather than asking, as the plurality
did, whether the federal rule "answers the question in dispute," Justice Stevens
asked "whether the scope of the federal rule is sufficiently broad to control the
issue before the court, thereby leaving no room for the operation of seemingly
conflicting state law." *Shady Grove*, 559 U.S. at 421.

        The Eighth Circuit has not yet determined which opinion in *Shady Grove* is
controlling.  However, under *Marks v. United States*, 420 U.S. 188 (1977),
"[w]hen a fragmented Court decides a case and no single rationale explaining the
result enjoys the assent of five Justices, 'the holding of the court may be viewed
as that position taken by those Members who concurred in the judgments on the
narrowest grounds . . . .'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153,
169 n.15 (1976)). Arguably, Justice Stevens' concurring opinion provides a
narrower basis for concurring in the judgment in *Shady Grove*.  But this Court
need not resolve whether Justice Stevens' opinion provides the controlling test
because this Court concludes that Minnesota's anti-SLAPP motion to dismiss
cannot be applied in federal court whether one applies Justice Stevens'
articulation of the first step of the analysis or the plurality's.

U.S. 1, 4-5 (1987); *Hanna v. Plumer*, 380 U.S. 460, 471 (1965) ("When a situation is covered by one of the Federal Rules, . . . the court has been instructed to apply the Federal Rule, and refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgress neither the terms of the Enabling Act nor constitutional restrictions."); *see also Kampa v. White Consol. Indus., Inc.*, 115 F.3d 585, 587 (8th Cir. 1997) (explaining that *Erie* is "irrelevant" where "an arguably procedural right is at stake, and the issue is addressed by a Federal Rule of Civil Procedure"); *Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1258 (8th Cir. 1996) (same).

Thus, we must first decide whether a Federal Rule answers the question in dispute or whether a Rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law.

### B. Whether Rule 12 or 56 Conflicts with the Motion to Dismiss Procedure in Minn. Stat. 554.02, subd. 2

The question before the Court is whether the plaintiffs' suit must be dismissed before trial because the plaintiffs have not provided sufficient evidence that Meridian and Stewart are not immune under Minn. Stat. § 554.02, subd. 2. *See Boulter I*, 842 F. Supp. 2d at 96 (framing the question before the court as "whether this Court may dismiss 3M's claims with prejudice on a preliminary basis based on the pleadings or on matters outside the pleadings merely

because 3M has not 'demonstrate[d] that the claim is likely to succeed on the

merits'") (quoting D.C. Code § 16-5502).  The Eighth Circuit has not addressed

the issue whether the motion to dismiss mechanism set forth in Minn. Stat. §

554.02, subd. 2, irreconcilably conflicts with the Federal Rules of Civil Procedure.

Meridian and Stewart point out that in other cases within the District of Minnesota

courts have applied the anti-SLAPP motion to dismiss provisions where

Minnesota law supplies the rule of decision.  (M&S Suppl. Mem. 6.)  However,

none of the cases on which they rely considered the potential conflict between

the motion to dismiss procedure in Section 554.02, subd. 2, and the Federal

Rules of Civil Procedure.  *See Moldex Metric, Inc. v. 3M Co.*, 14-1821

(JNE/FLN), 2015 WL 520722 (D. Minn. Feb. 9, 2015); *State Bank of Bellingham

v. BancInsure, Inc.*, No. 13-cv-900 (SRN/JJG), 2014 WL 4829184 (D. Minn. Sept.

29, 2014); *Hoyt v. Goodman*, No. 10-cv-3680 (SRN/FLN), 2011 WL 615511 (D.

Minn. Dec. 12, 2011).  Those cases provide no guidance in resolving the

question now before the Court.

　　　The Federal Rules of Civil Procedure provide two mechanisms for

resolving claims on the merits before a trial.  The first such mechanism is a

motion to dismiss for failure to state a claim under Rule 12(b)(6), and the second

is a motion for summary judgment under Rule 56.  Rule 12(b)(6) allows a

defendant to move for dismissal where, based only on the factual allegations

found in the complaint, taking those allegations as true, and taking all inferences

from those allegations in favor of the plaintiff, the complaint fails to state a claim

on which relief can be granted.  Fed. R. Civ. P. 12(b)(6); *Bell Atlantic v. Twombly*,

550 U.S. 544, 556 (2007) (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)

("Rule 12(b0(6) does not countenance . . . dismissals based on a judge's

disbelief of a complaint's factual allegations.").  A federal district court analyzing

such a motion is not permitted to consider matters outside the pleadings.[5]  *BJC*

*Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687-89 (8th Cir. 2003)

(concluding that it was reversible error for court to dismiss plaintiff's claims where

the court considered matters outside the complaint without converting the motion

to one for summary judgment and providing the plaintiff with notice and an

opportunity to respond).  As these authorities make clear, a court applying Rule

12(b)(6) engages in a different inquiry than a court applying Minnesota's anti-

SLAPP motion to dismiss standards; in the latter situation the court must

examine at evidentiary materials outside the face of the complaint.  *See*

*Leiendecker*, 848 N.W.2d at 230 ("[B]ecause the anti-SLAPP statutes require the

Leiendeckers to 'produce[] . . . evidence' and to 'go[] forward with the evidence'

in response to AWUM's anti-SLAPP motion, we conclude that the district court

---

[5]      There is no question that the evidentiary material both Plaintiffs and
Meridian and Stewart have submitting on the anti-SLAPP motion are matters
outside the pleading.  The affidavits and exhibits provided by the parties are not
the type of "documents necessarily embraced by the complaint [that] are not
matters outside the pleading."  *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791
(8th Cir. 2014) (explaining that matters outside the pleading include "any written
or oral evidence in support of or in opposition to the pleading that provides some
substantiation for and does not merely reiterate what is said in the pleadings,"
and citing, as an example of material embraced by the pleadings, contract
documents in a case involving a contractual dispute).

erred when it held that the allegations in the Leiendeckers' complaint were sufficient to defeat the motion.").

The Federal Rules of Civil Procedure expressly address the consideration of matters outside the face of the complaint to resolve pretrial motions directed at the merits of a claim. "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). What this means is that a federal district court can decide to ignore matters outside the complaint on a motion to dismiss for failure to state a claim, and if the court determines that the allegations of the complaint fail to state a plausible claim, the court will dismiss such a claim under the standards of Rule 12(b)(6). *Gorog*, 760 F.3d at 791 (the court "does not convert a motion to dismiss into a motion for summary judgment when, for example, it does not rely upon matters outside the pleadings"). But if matters outside the complaint are presented, and the court relies on those evidentiary materials to decide the motion, it must resolve the motion according to the summary-judgment standard of Rule 56. *See Gibb v. Scott*, 958 F.2d 814, 816-17 (8th Cir. 1992) (explaining that a district court must treat a motion to dismiss under Rule 12(b)(6) as a motion for summary judgment when matters outside the complaint are presented and not excluded by the trial court).

Stated differently, "Rule 12(d) links Rule 12 with Rule 56 to provide the exclusive means for federal courts to use to rule upon a pretrial motion to

14

adjudicate a case on the merits based on matters outside the complaint[.]"
*Boulter I*, 842 F. Supp. 2d at 98; *see also id.* at 96-100 (detailing the historical
treatment of motions attacking the merits of a plaintiff's case by presenting
matters outside the pleadings and explaining that the Federal Rules of Civil
Procedure now require any such motion to be governed by the summary
judgment standards of Rule 56).  As the courts in *Boulter I* and *Intercon Solutions*
amply demonstrated, there is no room in the system established by the Federal
Rules of Civil Procedure for the Court to dismiss a claim on its merits prior to trial
based on a consideration of evidentiary materials outside the pleadings other
than in the manner provided by Rule 56.  This Court agrees with the analysis of
the history and structure of Rules 12 and 56 found in *Boulter I* and *Intercon
Solutions*, and likewise concludes that "the Federal Rules of Civil Procedure do
not allow a federal court to dismiss a case without a trial based upon its view of
the merits of the case after considering matters outside of the pleadings, except
in those instances where summary judgment is appropriate."  *Intercon Solutions*,
969 F. Supp. 2d at 1046.

Minnesota's anti-SLAPP motion to dismiss procedure under Minn.
Stat.  § 554.02, subd. 2, as construed by *Leiendecker*, would require this Court to
dismiss a claim based on matters outside the pleadings in a manner that is not
permitted by the Federal Rules.  As noted above, a court analyzing such a

15

motion must consider matters outside the pleadings.[6] A court analyzing an anti-SLAPP motion under the Minnesota statute does not apply a Rule 56 summary judgment analysis. *Leiendecker*, 848 N.W.2d at 231 (comparing summary judgment motions to anti-SLAPP motions to dismiss). As the Minnesota Supreme Court explained:

> Under the anti-SLAPP statutes, therefore, the court is *required* to dismiss the claim, even in the face of genuine issues of material fact, if the responding party has failed to carry its burden of persuasion that the moving party is not immune by clear and convincing evidence. Under a summary judgment standard, by contrast, genuine issues of material fact *preclude* summary judgment. Thus, the two standards, which operate differently when genuine issues of material fact exist, are incompatible with one another.

*Id.* (emphasis in original) Applying Minnesota law, the court evaluating a motion under Minn. Stat. § 554.02, subd. 2, does not take reasonable inferences from the evidence in favor of the non-moving party. Instead, it must weigh the evidence and make a determination whether the plaintiff has clearly and convincingly persuaded the court that the defendant's conduct amounted to a tort or a violation of the plaintiff's constitutional rights. *Leiendecker*, 848 N.W.2d at 231 (describing the responding party's obligation to carry the burden of persuasion and "persuade the trier of fact of the truth of a proposition"). Accordingly, Minn. Stat. § 554.02, subd. 2, requires this Court to evaluate evidentiary material, such as affidavits, declarations, exhibits, and (perhaps) oral

---

[6] This strips the federal court of the discretion it has to exclude extra-pleadings submissions provided in connection with a motion under Rule 12(b)(6) or Rule 12(c). *See Gorog*, 760 F.3d at 791.

testimony, and determine whether a plaintiff's claims have merit in a manner that is in direct conflict with the standards of Federal Rule of Civil Procedure 56. *Intercon Solutions*, 969 F. Supp. 2d at 1046-47 (explaining that the special motion to strike under a similar provision of Washington's anti-SLAPP law "alters the procedure otherwise set forth under Rule 12 and Rule 56 for determining a challenge to the merits of a plaintiff's claim"); *Boulter I*, 842 F. Supp. 2d at 102 (explaining that under the District of Columbia's anti-SLAPP motion to dismiss procedure's standard "a court must grant the special motion to dismiss even where matters outside the pleadings are considered, and even where the plaintiff has or can raise a genuine issue of material fact on its claim"). For these reasons, this Court concludes that Rule 56 answers the question in dispute and is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of the anti-SLAPP motion to dismiss under Minn. Stat. § 554.02, subd. 2. Application of that state law in federal court would require dismissal of the plaintiffs' claims based on evidentiary matters outside the complaint in a manner that is not permitted by the Federal Rules of Civil Procedure.

There is an additional reason not to apply Minnesota's anti-SLAPP motion to dismiss procedure in federal court even where Minnesota law supplies the rule of decision. To apply Minn. Stat. § 554.02, subd. 2, and resolve disputed factual issues in the manner required by the Minnesota Supreme Court's decision in *Leiendecker*, would deprive the plaintiffs in this case of their constitutional right to a jury trial for their defamation and tortious interference claims. In *Leiendecker*,

17

the court noted that its understanding of the plain language of section 554.02, subd. 2, presented a potential deprivation of a plaintiff's constitutional right to a jury trial under the Minnesota Constitution.  848 N.W.2d at 231-33  But because the appellant had not raised that issue, the court declined to address it.

Here, however, the potential deprivation of the plaintiffs' constitutional right to a jury trial by application of Minn. Stat. § 554.02, subd. 2, is of sufficient importance to inform the Court's decision on the issue whether the anti-SLAPP procedure may be applied.  As repeatedly noted above, Minnesota's approach to the anti-SLAPP motion to dismiss permits a judge to resolve factual disputes by determining before trial whether a plaintiff has persuaded the court by clear and convincing evidence that the defendant's conduct was not immune because it constituted a tort or a constitutional violation.  Weighing evidence and resolving factual disputes is precisely what a jury does and what a judge is forbidden from doing under the Federal Rules of Civil Procedure when resolving pretrial motions directed at the merits based on evidence in the record.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (explaining that on summary judgment "the judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fairminded jury could return a verdict for the plaintiff on the evidence presented").  "[Summary judgment] by no means authorizes trial on affidavits.  Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether . . . ruling on a motion for summary judgment or for a directed verdict."

18

*Id.* at 255.  Applying the anti-SLAPP provision at issue here, and evaluating the evidence in the manner *Leiendecker* requires, would result in this Court having a bench trial based on affidavits and exhibits, rather than a jury trial.

The Seventh Amendment does not permit such an undertaking by a judge in the district court.  The Seventh Amendment provides that "[i]n suits at common law . . . the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.  "'[T]he right to a jury trial in the federal courts is to be determined as a matter of federal law in diversity [cases],' even if 'the substantive dimension of the claim asserted finds its source in state law,' because the 'federal policy favoring jury trials is of [such] historic and continuing strength.'"  *3M Co. v. Boulter (Boulter II)*, No. 11-cv-1527 (RLW), 2012 WL 5245458, at *2 (D.D.C. Oct. 24, 2012) (quoting *Semler v. Conner*, 372 U.S. 221, 222 (1963) (per curiam)); *See also Kampa v. White Consolidated Indus., Inc.*, 115 F.3d 585, 587 (8th Cir. 1997) ("The right to a jury trial in federal court is clearly a question of federal law.") (citing *Semler*, 372 U.S. at 222).

To preserve the right of trial by jury, it is proper in a diversity case or where the court is exercising supplemental jurisdiction to determine that a state law is inapplicable if it would allow an issue to be decided by the judge, rather than the jury.  The Supreme Court has reached precisely that conclusion.  *See Byrd v. Blue Ridge Rural Elec. Co-op., Inc.*, 356 U.S. 525 (1958).  Although the situation in *Byrd* did not specifically involve a claim for which the Seventh Amendment required a trial by a jury, the Supreme Court declined to apply a provision of the

South Carolina's Workmen's Compensation Act that required a judge to

determine an issue of state-created immunity.  Examining the argument that the

twin aims of *Erie*—to avoid inconsistent results in state and federal courts and to

prevent forum shopping—required trying the issue to a judge under application of

state law, the Supreme Court determined that that the federal court "should not

follow the state rule" because "[t]he policy of uniform enforcement of state-

created rights and obligations . . . cannot in every case exact compliance with a

state rule[]—not bound up with rights and obligations—which disrupts the federal

system of allocating functions between judge and jury."  *Id.* at 537-38 (internal

citations and footnote indicator omitted).

The Eighth Circuit reached a similar conclusion in *Kampa v. White*

*Consolidated Industries, Inc.*, 115 F.3d 585 (8th Cir. 1997).  It declined to apply a

Minnesota statutory provision requiring an action under the Minnesota Human

Rights Act "to be heard and determined by a judge sitting without a jury" because

to do so would violate the federal right to a jury trial. *Id.* at 586-87.  The court

reasoned that because an "arguably procedural" constitutional provision (the

Seventh Amendment right to a jury trial) controlled the issue before the court,

"the *Erie* analysis [was] equally inapplicable" as it would be in a case "where

either a Federal Rule of Civil Procedure or federal statute addresses an arguably

procedural point."  *Id.* at 587; *see also Grabinski v. Blue Springs Ford Sales, Inc.*,

136 F.3d 565, 571 (8th Cir. 1998) ("Although the issue was not raised on appeal,

we note that, contrary to the district court's belief, in a diversity case federal law

controls the issue of the right to a jury trial, even in cases . . . where the federal court is enforcing a state-created right and even when a state statute . . . would preclude a jury trial in state court.") (quoting *Kampa*, 115 F.3d at 587, and *Gipson v. KAS Snacktime Co.*, 83 F.3d 225, 230 (8th Cir. 1996) (alterations in *Grabinski* omitted).

Accordingly, applying the reasoning of *Byrd* and *Kampa* to the issue in this case, we are left with no other conclusion but that application of Minn. Stat. § 554.02, subd. 2, to adjudicate whether the plaintiffs' tort claims should be dismissed at the outset of the case would violate the plaintiffs' Seventh Amendment right to a jury trial.  *See also Boulter II*, 2012 WL 5245458, at *2 (concluding that the court could not apply the District of Columbia's anti-SLAPP motion to dismiss procedure because to do so would violate the right to a jury trial); 9 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure*, § 2303, p. 107 (3d ed. 2008) ("[Where] state law denies a jury trial, bu the Seventh Amendment requires that one be provided upon demand . . . it is clear that the federal court must allow a jury trial.").

### C. Meridian and Stewart's Arguments

Meridian and Stewart argue that there is no direct conflict between Minnesota's anti-SLAPP statutes and the Federal Rules of Civil Procedure because Rules 12 and 56 do not answer the same questions as the Minnesota anti-SLAPP statutes.  (M&S Suppl. Mem. 9-10.)  They argue that Rule 12(b)(6) provides a procedure for early dismissal of an insufficiently pled or otherwise

21

unviable claim at the pleading stage and Rule 56 provides a pretrial evidentiary-based determination of whether there are any genuine issues of material fact for trial.  But they assert that "[t]he Minnesota Anti-SLAPP statute serves a different function: it provides immunity for public participation and a mechanism for expedited evidentiary determination of whether the immunity provision applies." (*Id.* at 9.)

To support this argument, Meridian and Stewart rely on the First Circuit's opinion in *Godin v. Schencks*, 629 F.3d 79, 88 (1st Cir. 2010).  There, the First Circuit concluded that Rules 12 and 56 did not attempt to answer the same question, nor did they address the same subject matter as Maine's anti-SLAPP statute.  *Id.*  This Court concludes that the conclusion in *Godin* is based on a misapplication of *Shady Grove*.  The First Circuit in *Godin* concluded that Maine's anti-SLAPP statute could coexist with the Rules 12 and 56 because the latter "govern all categories of cases," but were not "addressed to special procedures for state claims based on a defendant's petitioning activity."  629 F.3d at 88-89. But the first step in the *Shady Grove* analysis specifically instructs a court to consider whether the Federal Rule at issue controls the issue before the court or is sufficiently broad to answer the question in dispute.  The anti-SLAPP statute cannot apply here precisely because Rules 12 and 56 are so broad that they govern the circumstances, in all categories of civil cases, under which a claim can be dismissed on the merits by looking at matters outside the pleadings.  After

exhaustively examining the text and purpose of Rules 12 and 56, the court in

*Boulter I* explained this flaw in the reasoning in *Godin*:

> This Court respectfully does not see how Rules 12 and 56 fail to answer the same question as the Anti-SLAPP Act because, as even the First Circuit acknowledged, Rules 12(b)(6) and 56 'are general federal procedures governing all categories of cases.' . . . [T]hose rules govern 'all categories of cases' and provide the exclusive means by which a motion may challenge the sufficiency of a claim. This is the *precise* reason why Rules 12 and 56 answer the question in dispute.

842 F. Supp. 2d at 107 (emphasis in original).

Meridian and Stewart also argue that because an anti-SLAPP movant

might bring a Rule 12 motion at the same time as a motion under Minnesota's

anti-SLAPP statute that "[t]he statute and the Rule have functioned nicely 'side

by side' here."  (Defs.' Mem.  9-10.)  To support this argument, they rely on the

Ninth Circuit's decision in *United States ex rel. Newsham v. Lockheed Missiles*,

190 F.3d 963 (9th Cir. 1999), in which the court concluded that a federal court

applying state law to breach of contract claims could apply California's anti-

SLAPP statute's special motion to strike despite the non-moving party's

argument that the state law created a direct conflict with the Federal Rules of

Civil Procedure.  *Id.* at 972.  As Meridian and Stewart point out, the court in

*Lockheed* concluded that there was no "'direct collision'" between the Federal

Rules and the special motion to strike under California's anti-SLAPP statute

because a party could file a Rule 12 or Rule 56 motion in the same case in which

it brings the motion under the state law.  *Id.*; (M&S Suppl. Mem. 9-10).  But this

reasoning, and the defendants' argument here, amounts to little more than the tautological statement that because a party chooses to file motions bearing different labels in the same case, they can co-exist.  The argument does not explain how a court can consider matters outside the complaint pursuant to the anti-SLAPP motion to dismiss standard under Minnesota's statute without conflicting with the Rule 56 standard for evaluating the merits of the case.  To the extent that the court in *Lockheed* believed California's anti-SLAPP statute's special motion to strike could coexist with Rule 56 since there was "no indication that Rules 8, 12, and 56 were intended to 'occupy the field' with respect to pretrial procedures aimed at weeding out meritless claims," 190 F.3d at 972, this Court respectfully disagrees with this rationale.  As described above, Rule 12(d) makes clear that when matters outside the complaint are presented to and not excluded by the court on a motion to dismiss (which is exactly what a court applying Minnesota's anti-SLAPP motion to dismiss is required to do), the motion *must be* converted to one for summary judgment.  *See Intercon Solutions*, 969 F. Supp. 2d at 1049 ("'*Lockheed's* explanation for the lack of conflict makes sense only if one assumes that the standards for a special motion to strike are no different from those of the Federal Rules.  If they are no different, allowing a state-created vehicle to test the plaintiff's claim does not conflict with the Federal Rules and the various vehicles coexist peacefully.  *If however, the standards are different . . . they conflict.*") (quoting *Rogers v. Home Shopping Network, Inc.*, 57

F. Supp. 3d 973, 982-84 (C.D. Cal. 1999)) (emphasis added in *Intercon Solutions*).

Moreover, *Lockheed* does not account for the deprivation of a plaintiff's Seventh Amendment right to a jury trial that would be accomplished by having the court weigh the evidence on an anti-SLAPP motion in the manner required by *Leiendecker*, and doing so here would be inconsistent with the Supreme Court's decision in *Byrd* and the Eighth Circuit's decision in *Kampa*. For these reasons, the Court rejects Meridian and Stewart's reliance on *Lockheed*.

Meridian and Stewart next argue that Rules 12 and 56 are not the exclusive means to dispose of claims on the merits prior to trial because "Minnesota has [state] procedural rules equivalent to Federal Rules 12 and 56, and the Anti-SLAPP statutes co-exist side by side with those rules, each within its own intended sphere of operation." (M&S Suppl. Mem. 10.) To support this argument, they rely again on language in *Godin*, which reasoned that Maine's anti-SLAPP statute could co-exist with Rules 12 and 56 because Maine had enacted "general procedural rules which are the equivalents of Fed. R. Civ. P. 12(b)(6) and 56." 629 F.3d at 88; (M&S Suppl. Mem. 10-11.) The problem with this reasoning is that a state is free to establish the procedural mechanisms it wants its courts to apply in proceedings in its own courts, but this does not mean that it can create a provision of state law that would dispose of claims in federal court prior to trial based on evidentiary material outside the pleadings by applying different standards than would be applied pursuant to Rule 56 on summary

25

judgment.  Minnesota's legislature can tell Minnesota courts how to resolve a pre-trial motion under the anti-SLAPP statute and apply a different standard than summary judgment, but in a federal case, if matters outside the pleadings are considered by the court, the only path for dismissal of a claim based on its lack of merit is through the gates of summary judgment.  *See Intercon Solutions*, 969 F. Supp. 2d at 1046 ("[T]he Federal Rules of Civil Procedure do not allow a federal court to dismiss a case without a trial based upon its view of the merits of the case after considering matters outside of the pleadings, except in those instances where summary judgment is appropriate.").

Finally, Meridian and Stewart argue that this Court must apply the anit-SLAPP motion to dismiss provision in Minn. Stat. § 554.02, subd. 2, because the anti-SLAPP statute is substantive, declining to apply it would create an unnecessary Rules Enabling Act problem, and because applying the law will further the twin aims of *Erie*.[7]  (M&S Suppl. Mem. 12-15.)

Meridian and Stewart's focus on the allegedly substantive character of Minnesota's anti-SLAPP statutes' provision creating immunity from liability is inapposite.  Minn. Stat. § 554.03 provides that "[l]awful conduct or speech that is genuinely aimed in whole or in part at procuring favorable government action is immune from liability, unless the conduct or speech constitutes a tort or a

---

[7]     Because this Court has concluded that Minn. Stat. § 554.02, subd. 2, cannot be applied in federal court based on the first step of the *Shady Grove* analysis, it does not reach the twin aims identified in *Erie* of avoiding forum shopping and promoting consistent results in state and federal courts.

violation of a person's constitutional rights."  This immunity from liability may well

be a substantive provision that is applicable in federal court where Minnesota law

supplies the rule of decision.  This immunity-creating provision in Minnesota's

anti-SLAPP law may ultimately form the basis of a defense to the plaintiffs' tort

claims, even on summary judgment, but we need not address that issue now.

We only address, at this stage, the applicability of the provision of Minnesota's

anti-SLAPP law that establishes the procedures for a motion to dismiss under

Minn. Stat. § 554.02, subd. 2, as construed by *Leiendecker*.  And we conclude

that the  procedure Minnesota's legislature set up for evaluating this immunity

through the lens of a motion to dismiss pursuant to Minn. Stat. § 554.02, subd. 2,

cannot be applied in federal court because doing so would directly conflict with

Rule 56 by requiring the weighing of evidence on a motion that considers matters

outside the complaint in evaluating the merits of a claim and would violate the

plaintiffs' Seventh Amendment right to a jury trial.

As far as Meridian and Stewart's argument that declining to apply Minn.

Stat. § 554.02, subd. 2, would create a Rules Enabling Act problem, Rules 12

and 56 are broad enough to answer the dispute at issue and Rules 12 and 56

were not adopted in violation of the Rules Enabling Act, 28 U.S.C. § 2072.  "[T]he

Supreme Court has rejected every Rules Enabling Act challenge to a Federal

Rule that has come before it."  *Boulter I*, 842 F. Supp. 2d at 110 (citing *Shady

Grove*, 130 S. Ct. at 1442 (plurality), and *Shady Grove*, 130 S. Ct. at 1457 ("the

bar for finding an Enabling Act problem is a high one") (Stevens, J., concurring)).

27

Like the court in *Boulter I*, this Court concludes that Rules 12 and 56 do not run afoul of the Rules Enabling Act or the Constitution. These Rules "fall squarely within the proper scope of the Rules Enabling Act." 842 F. Supp. 2d at 110.

It appears that Meridian and Stewart are also contending that the motion to dismiss procedure set up by section 554.02, subd. 2, must be applied because, in the words of Justice Stevens from his concurring opinion in *Shady Grove*, the state law is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right." *Shady Grove*, 130 S. Ct. at 1452 (Stevens, J., concurring); (*see also* M&S Suppl. Mem. 12 (citing *Godin*, 629 F.3d at 89, which relied on this language from Justice Stevens' concurrence).) In his concurring opinion in *Shady Grove*, Justice Stevens concluded that a federal court sitting in diversity could not apply a New York statute that prohibited a party from maintaining a class action in a case seeking statutory penalties or statutory minimum damages. 130 S. Ct. at 1457-60. Justice Stevens found that the relevant provision of New York's law did not "abridge, enlarge, or modify" New York's substantive rights or remedies because the state rule was one of procedure.[8] *See id.* at 1459-60. The upshot of Justice Stevens' conclusion is

---

[8]     Justice Stevens found it important that the New York statute at issue was "designed as a procedural rule[, which] suggests it reflects a judgment about how state courts ought to operate and not a judgment about the scope of state-created rights and remedies." *Shady Grove*, 130 S. Ct. at 1457. Section 554.02, subd. 2, of Minnesota's anti-SLAPP statutes is designed as a procedural rule. It is labeled as a matter of "procedure." And *Leiendecker* explains that "[t]he procedural provisions of the anti-SLAPP statutes, Minn. Stat. § 554.02, . . . set

(Footnote Continued on Following Page)

that a state law like New York's, which prohibits a party from maintaining a class

action in a specific type of case, does not abridge, enlarge, or modify a state right

or remedy, even though it would have "'substantive effects affecting society's

distribution of risks and rewards.'"  *Id.* at 1457 (quoting John Hart Ely, *The*

*Irrepressible Myth of Erie*, 87 Harv. L. Rev. 693, 724 n.170 (1974).)  There is no

question, especially in light of the alternative conclusion proposed in Part II of this

report and recommendation, that applying Minnesota's anti-SLAPP motion to

dismiss procedure would have a significant effect on this litigation.  Doing so

would cut off the plaintiffs' claims at an early stage of the proceedings, and

Meridian and Stewart would not have to engage in discovery or later file another

dispositive motion or proceed to trial.  But the same can be said of the Supreme

Court's decision in *Shady Grove* that New York's law could not be applied in a

federal diversity action because Fed. R. Civ. P. 23 answered the question in

dispute.  That decision in *Shady Grove* means that a federal case where a

plaintiff seeks statutory penalties and minimum damages, in which New York law

applies, could go forward as a potential class action, and a defendant would be

subjected to all of the burdens of discovery and litigation that would be present in

the usual federal litigation.  If subjecting a defendant to those "risks" and

---

(Footnote Continued from Previous Page)
out a unique procedural framework."  *See Leiendecker*, 848 N.W.2d at 228-29
(internal quotations omitted).  To the extent a state's characterization of the law
at issue as one of "procedure" is relevant to the analysis under *Shady Grove*
because Justice Stevens' concurrence supplies the applicable test, this Court
finds these statements support the conclusion reached here.

removing the potential "rewards" that application of the state law at issue in

*Shady Grove* would entail does not abridge, enlarge, or modify state created

rights, then subjecting Meridian and Stewart to the "risks" of litigation and

depriving them of the "rewards" of a motion to dismiss under the anti-SLAPP law

cannot be said to do so.  Accordingly, even if this Court is required to apply the

two-step test in the manner Justice Stevens articulated in his concurring opinion,

the motion to dismiss procedure established by Minn. Stat. § 554.02, subd. 2, is

not so intertwined with a state right or remedy that it functions to define the scope

of the state created right.

### D.  Conclusion to Part I

The motion to dismiss procedure established by Minn. Stat. § 554.02,

subd. 2, as interpreted by the Minnesota Supreme Court in *Leiendecker*

irreconcilably conflicts with Federal Rule of Civil Procedure 12 and 56 because it

requires the Court to weigh evidence in a manner that is expressly prohibited by

the Federal Rules.  Further, based on the Supreme Court's opinion in *Byrd v.*

*Blue Ridge*, and the Eighth Circuit's opinion in *Kampa v. White Consoludiated*

*Industries*, the motion to dismiss procedure in Minn. Stat. § 554.02, subd. 2,

cannot be applied in this case because doing so would violate the plaintiffs'

Seventh Amendment right to a jury trial.  For these reasons, the Court

recommends that Meridian and Stewart's anti-SLAPP motion to dismiss be

denied.

**II.      Whether The Plaintiffs Have Shown By Clear and Convincing Evidence That Meridian And Stewart Are Not Immune**

In the event that the District Court disagrees with this Court's conclusion, in Part I above, this Court makes the following proposed findings of fact and conclusions by applying Minnesota's anti-SLAPP statutes based on the record before it.  This alternative analysis is made for the benefit of the District Court should the District Court determine that the anti-SLAPP dismissal procedures can be applied in this case.  In the discussion that follows, this Court concludes that the plaintiffs have failed to meet their burden of showing that Meridian and Stewart are not immune.

**A.      The Plaintiffs have failed to show by clear and convincing evidence that Meridian and Stewart's conduct was not aimed at procuring favorable action.**

The plaintiffs first argue that they have presented clear and convincing evidence that Meridian and Stewart's conduct was not "aimed at procuring favorable government action and was not participation in a public project or controversy."  (Doc. No. 160, Pls.' Suppl. Br. and Submission in Opp'n to Anti-SLAPP Mot. Filed by Defs. Meridian Services, Inc., and Lucy Stewart 9, Heading, Part II.)  The plaintiffs contend that Meridian and Stewart are not immune because Stewart did not "seek a finding that Client A had, in fact, been abused" and because Stewart had no interest in the outcome of her reports.  (*Id.* at 10-11.)  Further, the plaintiffs assert that Stewart did not request favorable government action by virtue of having an alleged duty to assist in an

investigation.  (*Id.* at 11.)  Finally, the plaintiffs argue that Stewart's only goal in making the claim to the police and emergency medical services was to remove Client A from Unity and HWS, which Stewart had been trying to do throughout 2012.  (*Id.*)

Under Minnesota law, whether speech or conduct "was [genuinely] aimed at procuring favorable government action . . . is not solely determined by post-litigation statements in which the speaker [or actor] asserts subjective intent that the speech [or conduct] was to procure such action."  *Freeman v. Swift*, 776 N.W.2d 485, 489 (Minn. Ct. App. 2009).  The conduct or speech at issue is "aimed at procuring" favorable government action if it is "direct[ed] toward . . . an intended goal or mark" and its purpose is to "bring about [or] effect" favorable action from the government.  *Id.*  As used in the anti-SLAPP statutes "'[g]overnment' includes a branch, department, agency, official, employee, agent, or other person with authority to act on behalf of the federal government, [Minnesota], or any political subdivision of [Minnesota], including municipalities and their boards, commissions, and departments, or other public authority."  Minn. Stat. § 554.01, subd. 2.

### 1.    The plaintiffs are not relitigating the threshold issue

As an initial matter, Meridian and Stewart assert that the plaintiffs are merely trying to get this Court to reconsider the determination that the District Court made regarding the threshold showing necessary to trigger the plaintiffs' burden under the statute.  (Doc. No. 176, Defs. Meridian and Stewart's Resp. to

Pls.' Suppl. Br. in Opp'n to Anti-SLAPP Mot. ("M&S Suppl. Mem.") 11-12.)  This

Court disagrees.  The plaintiffs are asking the Court to determine that in their

response to the motion, they have shown that Stewart and Meridian had no intent

to procure favorable government action (or engage in public participation) when

they engaged in the conduct forming the basis for the plaintiffs' defamation and

tortious-interference claims.  One way that a party responding to an anti-SLAPP

motion can show that the moving party is not immune is to present clear and

convincing evidence that shows the moving party's conduct "was not aimed in

whole or in part at procuring favorable government action."  *Leiendecker*, 848

N.W.2d at 229; *State Bank of Bellingham*, 2014 WL 4829184, at *14 (explaining

that the responding party can meet its burden by making such a showing).

This only makes sense.  The threshold showing is a "minimal burden" the

moving party must meet to trigger the responding party's obligation to carry its

burdens of proof, production, and persuasion.  *See State Bank of Bellingham*,

2014 WL 4829184, at *12 (citing *Stengrim*, 784 N.W.2d at 841).  A moving party

could conceivably get over the threshold by making the minimal showing that its

conduct was aimed at procuring favorable government action, and then the

responding party could overcome that threshold showing by presenting more

persuasive clear and convincing evidence demonstrating that the moving party's

conduct did not, in fact, have such a purpose.  Accordingly, this Court concludes

that the plaintiffs are not merely attempting to relitigate the threshold-showing

issue as Meridian and Stewart argue.  Instead, the plaintiffs assert that they have

provided clear and convincing support and their evidence is sufficient to persuade the Court that Meridian and Stewart's conduct was not aimed, in whole or in part, at procuring favorable government action.

>    2.    **The plaintiffs have failed to show that Meridian and Stewart's allegedly tortious conduct was not aimed in whole or in part at procuring favorable government action**

>         a.    **The plaintiffs have not shown that Stewart's conduct was not aimed at the "government" within the meaning of the anti-SLAPP statutes**

Based on the parties' submissions, there does not appear to be any real dispute that Stewart's actions that form the basis of the plaintiffs' remaining defamation and tortious-interference claims were, at a minimum, directed to the "government," as that term is used in the anti-SLAPP statutes. Even if there were such a dispute, this Court concludes that Stewart and Meridian's allegedly tortious conduct was directed to the government. The conduct or speech at issue is Stewart's report to the police and to the Common Entry Point that Client A was being abused at HWS by a Unity employee. In addition, the plaintiffs allege that Stewart engaged in tortious conduct when she contacted emergency medical services to have Client A removed from the care of Unity and HWS and claimed that Client A was in danger. (*See* Doc. No. 141, Dismissal Order at 19-21 (describing parameters of the plaintiffs' defamation claims against Stewart and Meridian); *id.* at 23-24 (describing parameters of the plaintiffs' tortious-interference claims against Stewart and Meridian).)

The Common Entry Point ("CEP") is a county unit that each county in Minnesota must designate for individuals to contact when reporting suspected abuse of vulnerable adults, and under Minnesota law, the CEP is responsible for receiving reports of suspected maltreatment.  *See* Minn. Stat. § 626.557, subd. 9(a).  Plaintiffs make no credible argument that the CEP is not a part of a political subdivision in Minnesota.  The plaintiffs also do not contend that the police department, to which Stewart reported the alleged abuse, does not qualify as a part of the "government" for purposes of the anti-SLAPP analysis.

The plaintiffs assert, without citing support in the record or any provision of law or case law, that "Stewart's conduct in causing EMS to be called after the police refused to remove Client A and indicating that she (Stewart) had 'reason to believe' Client A was unsafe and was being abused is admittedly[9] not protected by the Anti-SLAPP law."  (Pls.' Suppl. Br. 11.)  The evidence relating to Stewart's call to EMS shows that Stewart contacted "Hennepin-EMS."  (Doc. No. 161, Suppl. Aff. of Paulette Wilson ("Suppl. Wilson Aff."), ¶ 13, Ex. G.)  Hennepin EMS appears to be connected to Hennepin County Medical Center (HCMC), where Client A was transported by the ambulance.  (*Id.*, Ex. H.)  But the plaintiffs provide no evidentiary support relating to Hennepin-EMS or HCMC.  As a result, the Court cannot conclude that the plaintiffs have met their burden of showing that Hennepin-EMS is not a "branch, department, agency, official, employee,

---

[9]      The plaintiffs point to no such admission in the record.

agent, or other person with authority to act on behalf of . . . [Minnesota], or any

political subdivision of [Minnesota,] . . . or other public authority."  Minn. Stat.

§ 554.01, subd. 2.[10]

        **b.**      **The plaintiffs have not shown by clear and convincing evidence that Stewart and Meridian engaged in conduct for self-serving reasons rather than conduct aimed, in whole or in part, at procuring favorable government action.**

      As a legal matter, the plaintiffs appear to argue that Stewart's purported

lack of interest or a personal stake in the outcome of her reports means her

conduct could not have been aimed, in whole or in part, at procuring favorable

government action.  But the plaintiffs offer no support for this proposition, and this

Court declines to adopt such an interpretation of Minnesota's anti-SLAPP law.

      Turning to the evidentiary submissions, this Court concludes that the

plaintiffs fail to provide clear and convincing evidence that Stewart and Meridian

had a self-interested motivation in reporting the suspected abuse to CEP, the

---

[10]     There does not appear to be any Minnesota case law addressing the issue whether contacting an emergency medical services provider can be conduct aimed at procuring favorable government action for purposes of the Minnesota anti-SLAPP law.  However, there does appear to be some support from other jurisdictions that statements made in furtherance of an investigation of public concern can be protected activity for purposes of other anti-SLAPP statutes.  *Cf. Hindu Temple and Community Ctr. of High Desert, Inc. v. Raghunathan*, 714 S.E.2d 628, 632 (Ga. Ct. App. 2011) ("Each of appellants' claims are predicated solely and exclusively upon appellees' statements to police *or statements made in furtherance of an ongoing investigation* regarding appellants' alleged criminal activity. Suffice it to say, such speech is 'in furtherance of the right . . . to petition government for a redress of grievances' and thus represents the type of speech that the anti-SLAPP statue is designed to protect.") (emphasis added).

police, or in contacting Hennepin-EMS. The plaintiffs contend that Stewart's true motivation for making those reports was to "get Client A away from Unity/HWS – as Stewart had been trying to do all year." (Pl.'s Suppl. Br. 11; *id.* at 7 (arguing that during MDH's investigation of the August 2012 incident involving Client A's allegation of abuse "Stewart admitted to [an] investigator that Client A in fact really wanted to stay at Unity earlier that year – and that she never said anything negative about the facility 'until now'").) To support their position on this issue, in the relevant section of their supplemental memorandum, the plaintiffs cite Exhibit C to the Supplemental Affidavit of Paulette Wilson. (Suppl. Wilson Aff., Ex. C.) Exhibit C is purportedly a copy of a transcription prepared from an August 2012 telephone conversation between Stewart and a representative of the Minnesota Department of Health (MDH), who was investigating the allegations that Client A had reported being abused. (Suppl. Wilson Aff. ¶ 8.) The plaintiffs assert that this exhibit shows that "Stewart admitted to MDH that she was instructed to remove Client A from Unity." (Pls.' Suppl. Br. 11.) During that telephone conference, an MDH representative asked Stewart whether Client A ever brought anything like "this" up before. (Suppl. Wilson Aff., Ex. C at 3.) Stewart explained that Hennepin County told her a month earlier that she needed to find a new placement for Client A with a facility other than HWS, and, at that time, Client A told Stewart that she wanted to stay at HWS's facility, so Stewart "[did not] know if it wasn't happening at that time." (*Id.*)

37

Exhibit C is anything but clear and convincing evidence that Stewart had only a self-serving reason to report the alleged abuse. For one thing, there are questions about the authenticity or potential admissibility of the transcription itself. Paulette Wilson does not purport to be a party to the conversation that Exhibit C allegedly records. She offers little or no detail in her affidavit about how the transcription was made. The transcription also appears incomplete, so the context of the conversation is lost.[11] Further, the portions of the transcript, on which the plaintiffs rely, leaves open the precise nature of what the conversation's participants are discussing. Where the MDH representative asks Stewart whether Client A ever brought anything like "this" up before, it is not clear whether by using the word "this," the MDH representative is referring to allegations of abuse or to Client A's desire to move out of the plaintiffs' facilities. In addition, the plaintiffs divorce a portion of Stewart's response—that Client A "never said anything negative about the facility until now"—from its context to

---

[11]   Meridian and Stewart argue that none of the evidence provided by the plaintiffs is admissible, and therefore they contend that the plaintiffs cannot meet their evidentiary burdens in this case.  (M&S Suppl. Mem. 12-14.)  Although this Court makes no ruling about the admissibility of any evidence in reaching the conclusions in this report and recommendation, it has taken into account the arguments concerning the admissibility of the plaintiffs' evidence in considering its persuasive value.  Even having considered the plaintiffs' exhibits that contain varying levels of hearsay, are not properly authenticated, or have other shortcomings under the Federal Rules of Evidence, this Court nevertheless concludes that the plaintiffs have failed to meet their evidentiary burdens and cannot survive the anti-SLAPP motion.

support their argument.  According to the transcription, Stewart's entire response
to the MDH representative's question was:

> No in um about a month ago we were I was told by Hennepin
> County that they were not going to renew the contract for [HWS] and
> so we needed find a new placement for [Client A] and so I talked to
> her about that and she really wanted to stay at the facility and so I
> don't know if it was happening at that time or why she would've
> wanted to stay, she wanted to stay then, I mean she never said
> anything negative about the facility until now.

(Suppl. Wilson Aff., Ex. C at 3.)  Rather than providing clear and convincing

support for the plaintiffs' contention that Stewart had been motivated since the

beginning of 2012 by a desire to get Client A removed from the care of Unity and

HWS, it appears Stewart was indicating that she did not think there had been any

earlier abuse.  Stewart's remarks indicate her belief that if Client A had been

abused earlier, she would not have told Stewart that she wanted to stay at the

facility only a month before Stewart's conversation with the MDH representative.

This is not clear and convincing evidence that Stewart's report to CEP, the

police, and to Hennepin-EMS was motivated by a self-interested desire either to

benefit her employer Meridian or harm the plaintiffs' business.

To further support their claim that Stewart and Meridian's long-term

motivation was to get Client A away from the plaintiffs' care and not to obtain

favorable government action, culminating in Stewart's allegedly fabricated reports

of abuse, the plaintiffs also submit emails from the early months of 2012 in which

Stewart stated that Client A had expressed desire to move from the HWS facility

where she was staying.  (*See* Pls.' Suppl. Br. 11 (discussing Stewart's goal in

making the reports and noting that Stewart "had been trying to [get Client A away from Unity/HWS] all year"); Suppl. Wilson Aff., Ex. A (email messages).)  In those emails Stewart and her supervisor at Meridian attempted to set up a meeting with plaintiffs' representatives to discuss Client A's plan of care, whether her family members needed to be involved in any discussions about Client A's care, and other matters.  (*Id.*)  However, Stewart's supervisor cancelled the meeting, and it never occurred.  (*Id.* at 4; Suppl. Wilson Aff. ¶ 6.)  Further, the plaintiffs provide Paulette Wilson's supplemental affidavit testimony that "Unity is certain that the claims of Stewart and [her supervisor] in February 2012 that Client A wanted to move [away from HWS and Unity] were knowingly false" because "[d]uring this same time frame, Client A and her family members always communicated to Unity that Client A did not wish to move."  (Suppl. Wilson Aff. ¶ 4.)

Even if this evidence is consistent with the plaintiffs' theory, it is not clear and convincing evidence that Meridian and Stewart engaged in a protracted plot to remove Client A from the plaintiffs' care.  At best it shows there were several disagreements between Client A's case manager and the Unity and HWS personnel with whom she coordinated Client A's care.  Unlike on a motion for summary judgment, in applying the anti-SLAPP motion-to-dismiss standards set forth in Minn. Stat. § 554.02 and *Leiendecker*, as the non-moving party, the plaintiffs get no benefit of the doubt on this evidence.  The Court must weigh the evidence before it and consider its persuasive value.  *Leiendecker*, 848 N.W.2d at 231.  Exhibit C and the emails from the beginning of 2012 that the plaintiffs

submit in support of this argument do little to persuade this Court that Stewart's call to CEP, her report to the police, or her call to Hennepin-EMS were aimed solely at undermining plaintiffs' care for and contract with Client A, rather than aimed, in whole or in part, at procuring favorable government action. Thus, the plaintiffs have failed to meet their burden in responding to the motion.

Because this Court is required, under Minnesota law, to weigh evidence in resolving the anti-SLAPP motion to dismiss, this Court notes that the foregoing conclusion is buttressed by the evidence that Meridian and Stewart provided in support of their anti-SLAPP motion. That evidence demonstrates that from the end of 2011 through June of 2012, Client A's communications fluctuated regarding her desire to continue living in an HWS facility. (Doc. No. 178, Decl. of Lucy Stewart ("Stewart Decl.") ¶¶ 6, 10, 11, 13, 14, 17.) On August 13, 2012, Stewart attended an assessment regarding Client A's long term care, along with a contract nurse from Unity. (*Id.* ¶ 18.) After the contract nurse left the assessment, a Unity/HWS staff member (identified by the randomly selected initials "AP"), told Stewart that she and the assessor needed to wrap up the assessment so that Client A would be able to eat that day. (*Id.* ¶ 19.) When AP left the room, Client A communicated to Stewart and the assessor that AP had been "hurting her" and that she wanted to move from the plaintiffs' facility. (*Id.*) Stewart called the Common Entry Point as she was leaving the facility and made a telephone report on her way back to Meridian's office. (*Id.*) Stewart also called the police on the advice of her supervisor and followed up again with Common

Entry Point to let them know of her conversation with a police officer.  (*Id.* ¶ 21.)

Then a representative from Adult Protection contacted Stewart to tell her to get

Client A out of the facility, which she did by asking for an ambulance to go pick

Client A up from the facility.  (*Id.* ¶ 22.)

Weighing this evidence against the less than clear and convincing

evidence provided by the plaintiffs, this Court concludes that the plaintiffs have

failed to meet their burden of showing that Stewart's report of the alleged abuse

of Client A to CEP, the police, and to Hennepin-EMS was not aimed in whole or

in part at procuring favorable government action.

> **B.    The plaintiffs have failed to present clear and convincing evidence that Meridian and Stewart's conduct constituted the torts of defamation or tortious interference with contract**

The plaintiffs also argue that clear and convincing evidence exists

demonstrating that Stewart's conduct was tortious.  They assert that Stewart

made materially false and misleading statements that constitute defamation, and

that Stewart's deceitful statements and blatant misrepresentations tortuously

interfered with the plaintiffs' contract with Client A.  (Pls.' Suppl. Br. 11-15.)

> **1.    The plaintiffs have failed to provide clear and convincing evidence that Meridian and Stewart's conduct was defamatory**

Under Minnesota law, to establish a claim for defamation, a plaintiff must

prove that the alleged defamatory statement (1) was communicated to someone

other than the plaintiff, (2) was false, and (3) tended to harm the plaintiff's

reputation and lower her in the estimation of the community.  *See Bahr v. Boise*

*Cascade Corp.*, 766 N.W.2d 910, 919-20 (Minn. 2009).  Because this Court is analyzing whether the plaintiffs in this case have proven the defamation claim in the context of an anti-SLAPP motion, the plaintiffs must provide clear and convincing evidence, which persuades the Court that Meridian and Stewart engaged in conduct meeting all three of these elements.  *See Leiendecker*, 848 N.W.2d at 229.  This Court concludes that the plaintiffs have failed to present clear and convincing evidence that Stewart made any false statements, and therefore, this Court concludes that the plaintiffs have failed to meet their burdens in opposing the anti-SLAPP motion.

### a.     Stewart's statements regarding Client A's desire to move

In their response to the anti-SLAPP motion, the plaintiffs contend that Stewart falsely stated, on several occasions, that Client A expressed a desire to move out of the HWS facility.  It is not clear that this conduct even forms a part of the defamation claim that the District Court believed the plaintiffs had stated. (*See* Doc. No. 141, Order at 19-21 (describing the alleged defamation in the Second Amended Complaint as Stewart's reporting of Client A's abuse allegations and contacting an ambulance).)  However, even if this were a part of a properly pleaded defamation claim, the evidence does not clearly and convincingly show that Stewart's statements on this issue were false.  The following evidence is relevant to these allegedly defamatory statements.

Around December 30, 2011, Stewart learned that Hennepin County was planning not to renew its contract with Unity and that all of Unity and HWS's clients would need to be relocated by the end of January 2012. (Doc. No. 178, Stewart Decl. ¶ 8.) Stewart struggled to find a new location for Client A to move to, but eventually located her a spot with an organization called Caring Nurses. (*Id.* ¶¶ 9-10.) Unity contacted Stewart through Unity's counsel on January 25, 2012, to tell Stewart that Client A no longer wanted to move from HWS's facility. (*Id.* ¶ 11; Suppl. Wilson Aff., Ex. K.) On January 31, 2012, Stewart and her supervisor met with Client A, and Client A expressed to Stewart that she was excited about moving from HWS's facility to a new location. (Stewart Decl. ¶ 13.) On February 9, 2012, Stewart sent an email to Paulette Wilson at Unity and HWS, stating that Client A had chosen to move to a different facility after Stewart informed Client A of her options. (Suppl. Wilson Aff., Ex. A at 1; *see also* Suppl. Wilson Aff. ¶ 5 (stating that on Feb. 9, 2012 "Stewart wrote an e-mail to Unity falsely stating that Client A personally told Stewart that Client A wanted to move.").) However, according to Wilson, during February 2012, "Client A and her family members always communicated to Unity that Client A did not wish to move" and that Client A "denied telling Defendants that Client A wanted to move." (Suppl. Wilson Aff. ¶ 4.) Wilson further states that in June 2012, Stewart wrote to Client A "and informed her of a pending attempt by MDH to revoke Unity's licenses and explaining that Client A had the right to move or stay with Unity although Unity had already informed Client A and all clients of the pending

44

revocation action." (*Id.* ¶ 9.)  Stewart confirms that during June 2012 she sent a

letter to Client A about MDH's decision not to renew Unity's license and told her

that she had a choice about whether to move.  (Stewart Decl. ¶ 17.)  Throughout

Stewart's time as Client A's case manager, Stewart says that Client A "fluctuated

in her communications about her desire to stay in her current living situation."

(*Id.* ¶ 6.)

      Although the plaintiffs repeatedly assert that Stewart's statements about

Client A's desire to move away from Unity and HWS's care at various times

during 2012 were false, they offer no clear and convincing proof that Stewart

ever made any false statement of fact.  Even if the Court credits Paulette

Wilson's hearsay affidavit testimony about what Client A's family members said

regarding Client A's desire to move and their denial that Client A ever told

Defendants that she wanted to move, this evidence is far from clear and

convincing.  There is no detail whatsoever about the statements that Client A or

her family members allegedly made.  No dates are provided.  No specific

statements are attributed.  No indication is given of the person or persons with

Unity or HWS to whom such statements were made.  Wilson does not even claim

that she has personal knowledge of any of these out-of-court statements she

attributes to others.  Thus, the plaintiffs have not provided clear and convincing

evidence that shows Stewart was misrepresenting what Client A had

communicated to her about her fluctuating interest in moving.

Further, the plaintiffs have made no showing that Stewart's statements in the June 2012 letter she sent to Client A about MDH's decision not to renew Unity's license was false or misleading.  They claim "there was no need for Stewart to do that because Unity" already told Client A about the pending revocation (Pls.' Suppl. Br. 5-6), but making statements that are unnecessary is not the same as making statements that are false.  Moreover, Meridian had received an email from Hennepin County regarding MDH's decision not to renew Unity's license one month earlier, and in that email Hennepin County instructed case managers to inform Unity residents that, if Unity did not prevail in its appeal, Unity might not be able to provide them with services any longer.  (Doc. No. 179, Decl. of Leann Thompson ("Thompson Decl."), Ex. C at 1.)  Given this evidence, there was nothing remotely false or misleading about Stewart's June 2012 letter.

In addition, Wilson's statement in paragraph 4 of her Supplemental Affidavit that "Unity is certain that [Stewart's] claims . . . in February 2012 that Client A wanted to move from Unity were knowingly false" has no evidentiary value.  *Cf. Bacon v. Hennepin Cnty Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008) ("'[A] properly supported motion for summary judgment is not defeated by self-serving affidavits.'") (quoting *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831 (8th Cir. 2008)).

The plaintiffs again rely on Stewart's August 2012 conversation with an MDH representative to suggest that Stewart's assertions that Client A wanted to move during the early months of 2012 were false.  During that conversation,

46

Stewart made the statement that Client A had never said anything negative about the facility before August 2012. (Suppl. Wilson Aff., Ex. C at 3.) But, as noted above, the plaintiffs have taken Stewart's statements to the MDH investigator out of context, and when that statement is properly considered, Stewart is not contradicting her earlier statements that Client A expressed a desire to move. Rather, Stewart was confirming that Client A had not previously complained of abuse. Stewart's own declaration confirms this. (Stewart Decl. ¶ 20.) Thus, Exhibit C to Paulette Wilson's Supplemental Affidavit does not provide clear and convincing evidence that persuades this Court Stewart was making false statements.

Weighing all this evidence, as the Court must in assessing a motion to dismiss under Minnesota's anti-SLAPP law, the plaintiffs have failed to persuade this Court by clear and convincing evidence that any of Stewart's statements about Client A wanting to move were false.

>    **b.    Stewart's statements regarding Client A's allegations of abuse, her statements to CEP that Client A was in danger, and her report to the police**

The plaintiffs contend that Stewart's "communication to third parties that Client A was in imminent danger on August 13, 2012 was blatantly false and a reckless description of the information Stewart allegedly learned during her communication with Client A." (Pls.' Suppl. Br. 12.) In support of this position the plaintiffs point to a few pieces of evidence. In the CEP intake form related to Client A's allegations of abuse, which is dated August 13, 2012, there is an

47

indication that Client A is a "vulnerable adult in imminent danger." (Suppl. Wilson Aff., Ex. E at 2.) To show that this was false, the plaintiffs rely on Exhibit I to the Supplemental Affidavit of Paulette Wilson, which purports to memorialize notes prepared by an MDH investigator who was following up on Stewart's assertion that Client A had reported being abused. (Suppl. Wilson Aff. ¶ 13; *id.*, Ex. I.) According to these notes, Stewart told the MDH investigator that when she reported the alleged abuse to Stewart, Client A wrote on a sheet of paper that a staff person abused her, but that Client could not articulate what the abuse involved more specifically. (*Id.*, Ex. I.) The notes also state that Client A's case managers "are not sure of the credibility [of Client A's report of abuse], but she never made [such] allegations before." (*Id.*, Ex. I.) The plaintiffs have also submitted a purported transcript of a telephone conversation between Patricia Helland, a contract nurse working with Unity and HWS, and an MDH representative who was investigating the allegations of abuse. (Suppl. Wilson Aff. ¶ 11 & Ex. D.) In that conversation Nurse Helland states that she observed Client A deny being abused the same day Stewart reported the events occurred. (*Id.*, Ex. D at 12 ("I just heard [Client A] verbally tell [Stewart and the assessment nurse] and they asked her have you any concerns about anybody hurting you and [Client A] said no and it was real clear."); *see also id.*, Ex. J at 3 (noting that Nurse Helland "did report that the Case Manager & Hennepin County Nurse asked the Client if she was concerned/worried about being hurt . . . Client responded 'No.'").)

Stewart confirms that she and an assessment nurse met with Client A on

August 13, 2012 at the HWS facility, and that Nurse Helland was in the room with

them when they were meeting with Client A.  (Stewart Decl. ¶ 18.)  At some

point, however, Nurse Helland left the assessment and the Unity staff person,

identified as AP, came into the room and told the assessment nurse and Stewart

that they needed to wrap up the meeting so that Client A would be able to eat.

(*Id.* ¶ 19.)  After AP left the room, Client A indicated that someone at the facility

was hurting her and identified AP as the person mistreating her.  (*Id.*)  Client A

then told Stewart and the assessment nurse that she wanted to "move now!"

(*Id.*)  Client A told Stewart not to talk to Unity staff about the allegation of abuse.

(*Id.* ¶ 20.)  Based on that conversation, Stewart decided to contact CEP and

report the allegations of abuse.  (*Id.* ¶ 21.)

Weighing this evidence, this Court concludes that the plaintiffs have failed

to provide clear and convincing evidence that Stewart simply made up Client A's

allegations of abuse.  Nor have they demonstrated that Stewart acted recklessly

with regard to Client A's report of abuse.[12]  The plaintiffs have presented no

evidence that would lead this Court to be persuaded that Client A did not, in fact,

report being mistreated by AP.  And given that Client A told Stewart not to tell

any of Unity's staff members about the report of abuse, there would be nothing

---

[12]    For example, the plaintiffs also offer no support for the proposition that "[i]t
is highly probable that Stewart knew that the alleged abuse claims were unlikely
to be substantiated."  (Pls.' Suppl. Br. 13.)

false, reckless, or misleading about communicating to CEP that Client A was in imminent danger.

The plaintiffs also assert that Stewart "caused a false and misleading report to be made resulting in EMS forcibly removing Client A from Unity." (Pls.' Suppl. Br. 6.) They assert that Stewart "falsely represented to EMS that she 'had reason to believe' Client A was being abused by her caregivers." (*Id.*) However, given that Client A reported to Stewart and the Hennepin County assessment nurse that she had been mistreated by AP, Stewart did have a "reason to believe" that Client A had been harmed. (Suppl. Wilson Aff., Ex. G at 1 (comments under "Incident" column of Hennepin-EMS form).) The plaintiffs have not demonstrated that Stewart made any false or misleading statements in her report to EMS of what she was told by Client A.

The plaintiffs contend that Stewart's statements concerning Client A's allegations of maltreatment "are not worthy of credence because she willingly falsified information regarding Client A." (Pls.' Suppl. Br. 13.) They assert that "[w]hen making the claim that Client A reported abuse, Stewart also told several third parties that Client A's family was not positively involved and that Client A did not want her family involved[, when] [i]n fact, Client A had requested that her family be involved, and provided authorization for the same." (*Id.*) According to the plaintiffs, because Stewart allegedly made false statements about Client A's family members' involvement, the Court should conclude that Stewart fabricated Client A's report that she was mistreated. Plaintiffs cite a note dated February

50

14, 2012, in which Client A indicated that she would like to have her sisters speak on her behalf with respect to her care and needs, and gave her sisters permission to speak with her doctors, county case management, and the nurses at her residence.  (Suppl. Wilson Aff., Ex. L.)  The plaintiffs also point out that through email communications that occurred earlier in 2012, Stewart knew that Client A's family members were to be involved in her care.  (*See* Suppl. Wilson Aff., Ex. A at 1 (Feb. 9, 2012 email from Stewart to HWS noting that Client A had given her permission to talk to two family members); *id.* at (Mar. 1, 2012 email from Paulette Wilson to Stewart's supervisor indicating that Client A requested that her family participate in all meetings).)  Although the plaintiffs do not point the Court to any portion of the record that shows Stewart falsely claimed that Client A's family was not involved, based on this Court's own review of the record, there is an indication in the CEP intake form provided by the plaintiffs, that Stewart "reported that [Client A] does not really want her family involved in helping her."  (Suppl. Wilson Aff., Ex. E at 3.)  However, it is not clear from this statement whether Stewart was stating that Client A did not want her family members involved in helping her *at all* or that Client A did not want her family members involved in helping her with respect to the allegations of maltreatment. The plaintiffs have not provided any explanation of how this statement was actually false.  Again, there is just no context for the Court to conclude that Stewart made a false or misleading statement.  Nor do the plaintiffs explain how

any statement about Client A's family's involvement, even if false, tended to harm the plaintiffs in their reputation or lower them in the estimation of the community.

Further, even if this conflict in the evidence calls Stewart's credibility into question, other evidence in the record confirms Stewart's account that Client A actually reported being abused. For example, a medical record from Hennepin County Medical Center indicates that Client A "[s]tate[d] yes when asked if she feels unsafe." (Suppl. Wilson Aff., Ex. H.) Given this corroboration of Stewart's account, the Court is not persuaded that Stewart simply made up the allegations of abuse.

The plaintiffs also assert that Stewart's claim that Client A "wrote down on paper that she was being abused at Unity and wanted to move right away . . . is untrustworthy because Client A's physical limitations do not allow her to write legibly." (Pls.' Suppl. Br. 7.) According to CEP's intake follow-up notes, Stewart reported that "Client A wrote on a sheet of paper that a staff person abused her." (Suppl. Wilson Aff., Ex. I.) There is evidence that communicating with Client A is challenging, and that she had difficulty writing. (Suppl. Wilson Aff. ¶ 14.) However, there is also evidence in the record that in January 2012, Client A could legibly write "I want to move" on paper. (Thomson Decl., Ex. B.) Given that there is at least some indication in the record that Client A was capable of communicating in writing, it is not clear that Stewart made up the story about Client A writing down that she had been mistreated on August 13, 2012.

Accordingly, this Court will not discredit Stewart's statements that Client A reported being mistreated by AP.

Weighing all the evidence in the record, this Court concludes that the plaintiffs have not clearly and convincingly shown that Stewart made any false statements that could form the basis of a defamation claim.

> **2.    The plaintiffs have failed to provide clear and convincing evidence that Meridian and Stewart tortuously interfered with their contract with Client A**

To prove a claim of tortious interference with contract, the plaintiffs must show (1) that plaintiffs had a contract with a third party; (2) that the defendants had knowledge of the contract; (3) that the defendants' intentionally procured a breach of that contract; (4) that the defendants did so without justification; and (5) that they sustained damages as a result of the defendants procuring such a breach. *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998).

The plaintiffs argue that "[i]n addition to defaming Unity with her false abuse and imminent danger allegations, Stewart also engaged in trickery, deceit, and blatant misrepresentations to forcibly have Client A removed from Unity." (Pls.' Suppl. Br. 14.)  Further, they allege that Stewart "[c]aus[ed] others to repeat false claims that Client A had to leave Unity in August 2012, against her will, because she was being abused was deceitful and trickery." (*Id.*)  And they assert that Stewart "falsely claimed that [Client A] did not [have a right to remain at Unity], causing Client A to be removed from Unity by EMS personnel, [which]

[i]s separate and apart from the defamatory statements made that Client A was being abused." (*Id.*)

The plaintiffs do not cite to a single exhibit or other piece of evidence in the portion of their brief specifically addressing their argument that Stewart tortiously interfered with plaintiffs' contract with Client A. And despite the assertion that their tortious-interference claim is based on conduct that is "separate and apart from the defamatory statements" regarding Client A's assertion that she was abused, as best this Court can discern, the plaintiffs' tortious-interference claim is premised on the same conduct that underlies the plaintiffs' defamation claim. It appears the plaintiffs essentially equate the claims. (*See* Pls.' Suppl. Br. 14 ("The defamatory conduct of Stewart and her use of trickery and deceit to have Client A removed constitute the torts of defamation and tortious interference.").) As Meridian and Stewart correctly point out, where a tortious interference claim is based on the same conduct as that underlying a defamation claim which lacks evidentiary support, the tortious interference claim must also be dismissed. *See Martin v. First Advantage Background Servs. Corp.*, Civil No. 11-3357, 2014 WL 1260392, at *14 (D. Minn. Mar. 26, 2014) ("'[W]hen the same defamation forms the basis of both a tortious interference and defamation claim, the tortious interference claim is encompassed by the defamation claim. Hence, respondents cannot sustain their separate tortious interference claims.'") (quoting *Am. Iron & Supply Co. v. Dubow Textiles*, No. C1-98-2150, 1999 WL 326210, at *5 (Minn. Ct. App. May 25, 1999)); *Dunham v. Opperman*, No. A06-750, 2007

WL 1191599, at *6-7 (Minn. Ct. App. 2007) (citing *Wild v. Rarig*, 234 N.W.2d 775

(Minn. 1975) (tortious interference claim based on the same facts as defamation

claim properly dismissed as encompassed by the defamation claim)).  Thus, this

Court concludes that the plaintiffs have failed to show, by clear and convincing

evidence, that Meridian and Stewart tortuously interfered with the plaintiffs'

contract with Client A, and this claim should be dismissed.

### C.    Conclusion to Part II

Based on the discussion in Part II of this Report and Recommendation,

this Court alternatively concludes that, if Minn. Stat. § 554.02, subd. 2, can be

applied in federal court, the plaintiffs have failed to meet their burden of

presenting clear and convincing evidence that Meridian and Stewart are not

immune under Minnesota's anti-SLAPP law.  Should the District Court disagree

with the conclusions reached by this Court in Part I of this Report and

Recommendation, this Court recommends that Meridian and Stewart's motion to

dismiss under the anti-SLAPP law be granted, and the plaintiffs' defamation and

tortious-interference claims against Meridian and Stewart should be dismissed.

## RECOMMENDATION

For all the reasons above, this Court **HEREBY RECOMMENDS** that

Meridian and Stewart's Motion to Dismiss (Doc. No. 125), be **DENIED** for the

reasons stated in Part I of this Report and Recommendation.

Date: April 16, 2015

 s/ Jeffrey J. Keyes
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **April 30, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.